Gordon, Secretary of Banking, *v.* Anthracite Trust Company.

Argued January 23, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*H. C. McGrath,* with him *Welles, Mumford & Stark,* for appellant.

*Reese H. Harris,* Special Deputy Attorney General, with him *William A. Schnader,* Attorney General, *Shippen Lewis,* Special Deputy Attorney General, and *Frank E. Donnelly,* Special Counsel, for appellee.

OPINION BY MR. JUSTICE SCHAFFER, April 23, 1934:

In January, 1929, the board of directors of Timothy Burke, Inc., a corporation, decided to buy 200 shares of Associated Dry Goods stock. It was concluded the transaction should be in the individual name of Frank X. Burke, president of Timothy Burke, Inc. The company advanced $6,500 and the remainder of the purchase price was raised through a note for $6,610 which Burke signed individually in favor of the Anthracite Trust Company. The Associated Dry Goods stock thus purchased, in the name of Burke, was pledged as collateral security for Burke's note. The official of the trust company who negotiated the loan knew that the purchase of stock was made for the corporation and that such was the use to be made of the money raised by Burke through his individual note.

It is admitted that Timothy Burke, Inc., paid the interest on the note and at one time made a reduction of

$1,350. Dividend checks were sent to Burke and by him endorsed over to the company. On January 2, 1930, the Associated Dry Goods stock was sold, and from the proceeds of the sale, together with an additional amount advanced by the company, 200 shares of United Gas Improvement stock were purchased. These shares were pledged for the loan in lieu of those sold. The indebtedness later came to be represented by two notes, both of which were executed by Frank X. Burke as an individual.

On September 11, 1931, the trust company passed into the hands of the secretary of banking. At that time there was owing to the trust company on the notes $5,260, and Timothy Burke, Inc., had on deposit with the trust company $5,501.04, which the corporation requested the secretary of banking to set off against the obligation of the notes. This the secretary of banking refused to do, and insisted that the notes be paid. The court below confirmed the action of the secretary when his account came before it, and dismissed the exceptions of Timothy Burke, Inc. This appeal followed.

On December 1, 1931, after the trust company passed into the control of the secretary of banking, the board of directors of Timothy Burke, Inc., passed resolutions reciting, inter alia, that the stocks purchased in Burke's name were held by him as trustee for the corporation, that the notes were executed by him as its agent and on its behalf, were its obligations, and that it assumed their payment. In the resolutions the secretary of banking was requested to use as an offset against the notes the funds on deposit to the credit of the corporation.

It is obvious that these resolutions can have no effect, passed as they were after the trust company went into the control of the State. The rights of the parties to a set-off were fixed at the time the bank closed: U. S. Brick Co. v. Middletown Shale Brick Co., 228 Pa. 81, 87; Thacher's Est., 311 Pa. 278, 282. On the other hand, if the resolutions merely restated the situation as it in

fact existed and was known to all parties, prior to the closing of the bank, we must examine the problem in the light of those facts.

In opposition to the right of set-off it is pointed out that the trust company could not have brought suit against the corporation on the notes since the signature of the corporation does not appear thereon. That this is so appears clearly from the Negotiable Instruments Law, Act of May 16, 1901, P. L. 194, chapter 1, article I, section 18, 56 P. S. 132, section 23. See also American Law Institute's Restatement of the Law of Agency, volume 1, page 382, section 152.

As sustaining the right of set-off it is pointed out that the entire transaction from its inception was a corporation matter, that the money was borrowed for the corporation, in order that it might speculate in the stock of another company, and that the money borrowed on Burke's note was in fact so used, as was known to the officials of the trust company.

Upon several occasions, when called upon to decide problems of set-off, we have looked through the transactions as they appeared on their surface in order that we might determine the real facts and the true intention of the parties. In Gordon, Secretary of Banking, v. Union Trust Co., 308 Pa. 493, two trust companies deposited their trust funds with each other. Upon the taking of possession of one by the secretary of banking and the claim of the secretary for the amount of the trust deposit, the other company claimed a set-off against it because of the trust fund deposit it had in the closed institution. There we looked through names to the realities of the situation and accordingly determined that the true owners of the two deposits were entirely different persons, and on the basis of this fact we concluded there was no mutuality of right. Mr. Justice KEPHART, speaking for the court, said: "The names in which suit could be brought and defended furnish an indication, but are not the only criterion, of the right of set-off. To whom

do the funds really belong?  Mutuality of right in a set-off is not circumscribed by the 'right to bring an action,' but the broader question may be and generally is of importance.  Whose money or claim is proposed to be used as a set-off?  This is the true equitable principle which governs such question."

In U. S. Bank and Trust Co. Case, 311 Pa. 320, certain property owned by the Venus Silk Hosiery Company was conveyed to five of its stockholders who mortgaged it to the Allegheny Title & Trust Company, after which the property was reconveyed to the hosiery company subject to the mortgage.  The money thus raised was deposited to the credit of the hosiery company with the trust company.  Subsequently the trust company was taken over by the secretary of banking, and at the time of his taking possession the hosiery company had money on deposit.  When it claimed the right to use the deposit as a set-off against the mortgage indebtedness it was confronted with the fact that the mortgage had gone into a trust in which participation certificates had been issued to third persons.  The case turned on the intervening rights of the certificate holders.  Mr. Justice SIMPSON wrote: "No one would question the equitable right of the hosiery company to have its claim of set-off, if the question were one between it and the bank only: Somerset Colliery Co. v. John, 219 Pa. 380.  It is conceded, also, that such right would exist though the case was not strictly within the purview of the Defalcation Act.  This has been frequently decided, but is nowhere better expressed than in the following language from Hibert v. Lang, 165 Pa. 439, 442, which is quoted and approved in Craighead v. Swartz, 219 Pa. 149, 154; Marshall v. Brainerd, 253 Pa. 35, 39-40, and Com. v. Crow, 294 Pa. 286, 291: 'In general, in order to support a set-off there must be cross demands between the same parties and in the same rights, *such as would sustain mutual actions against each other,* yet wherever there is the practicability of avoiding circuity of action and needless

costs, with safety and convenience to all parties......
or where there is a special equity to be subserved, *and
no equity of third parties to be injured,* a set-off will be
allowed upon equitable principles, though the case does
not come within the language of the statute.' " It is to
be noted that the five individual stockholders and not the
corporation executed the bond which formed the mort-
gage indebtedness in that case. It is true the property
of the corporation was subject to the mortgage. In that
respect the case is analogous to the present one, for the
pledged stock, which as between Burke and his corpora-
tion clearly belonged to the latter, was subject to the
loan made by the trust company. It is not to be doubted
that the corporation could at any time prior to the clos-
ing of the bank have insisted that the bank should ap-
propriate its deposit account for the purpose of releasing
the lien against the stock of which the corporation was
the equitable owner.

The case, however, which we think is closest to that
at bar, although not cited in either brief, is Estate of the
Van Haagen Soap Co., 141 Pa. 214. The opinions of the
auditor, the lower court, and of this court have much
discussion which is relevant here. The controversy in
that case arose upon the distribution of the assets of the
Van Haagen Soap Manufacturing Company in the hands
of an assignee for creditors. Two claims were filed, each
in the amount of $5,000. One claim was made by the
National Security Bank for a loan, for which the bank
took the note of Anthony Van Haagen, payable to the
order of John Hunter, and by him endorsed; the other
claim arose out of a loan by one Lambert for which he
took the note of John Hunter. Both claims were ob-
jected to on the ground that they were loans, not to
the Van Haagen Soap Company, but to Anthony Van
Haagen and John Hunter respectively, and that there
was no liability on the part of the company to pay them.
The contention on the other side was that the respective
loans were in fact negotiated for and on behalf of the

company, and that although the notes of Van Haagen and Hunter, respectively the superintendent and the principal stockholder of the company, were, for supposed prudential reasons, taken as security for payment thereof, the company actually incurred the debt and was liable therefor.

The auditor determined the question of the company's liability solely upon the fact that upon neither of the notes did the name of the company appear. He was of opinion, therefore, that "the relation of debtor and creditor was not created, and at no time existed between these claimants and the soap company." Upon review of the auditor's report by the court, exceptions filed by the two claimants were sustained; on appeal we affirmed. In the course of our opinion it was pointed out that, had it merely appeared that the claimant bank had discounted Hunter's note, the proceeds passing to his individual credit as they did, the bank would have been obliged to rely upon the parties to the note for payment. The analogous principle was also pointed out that if a partner borrows a sum of money, and gives his own security for it, it does not become a partnership debt merely because it is applied to partnership purposes. It was conceded that the presumption was that the note was discounted for the parties, or that the note was given as a consideration and not as a security for the money. We said, however, at page 230, that "this is only a presumption of fact, and may be rebutted by showing the actual intent of the parties to have been otherwise. . . . . . . It was competent, therefore, for the National Security Bank to show that the money was, in fact, loaned to the company for the company's use; that the transaction was not the discount of a note, but a loan of money to the company, the note being in the nature of a collateral security for the repayment thereof." We said further, at page 231: "There can be no doubt but that the money in both cases at bar was borrowed for the use of the company. Both loans were solicited in the first

instance by Van Haagen, to provide means for the purchase of stock and materials for the company. It is of no consequence that the money was put to the credit of John Hunter, for John Hunter was the company's banker; he owned practically all of the stock, and the company's funds were, up to that time at least, supplied from and deposited in his private account. ...... But, from the tenor of the testimony as a whole, there can be no conclusion of fact more clear than that both these loans were effected for the use and benefit of the Van Haagen Soap Manufacturing Company. It is equally clear, not only from what occurred at the time, but before and after, that this was the understanding of all the parties concerned; not only of Van Haagen, Hunter, and the soap manufacturing company on the one side, but of the bank and Lambert on the other; and also that the money ultimately went into the company, and was used in the business."

In our opinion the reasoning of the foregoing case is determinative of the problem before us. We might refer also to Kendrick State Bank v. First Nat. Bank of Portland, 213 Fed. 610 (C. C. A., 9th Cir.); 21 L. R. A. (N. S.), at page 1073, "Liability of principal on original consideration."

We conclude that the corporation should be permitted to set-off against its obligation to pay for the stock held by the trust company in Burke's loan account the amount which it had on deposit with the trust company.

The order of the court below is reversed. Costs to be paid out of the fund in the hands of the secretary of banking.