Hillcrest Foundation, Inc., Appellant, *v.*
McFeaters et al.

Argued October 3, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Friedjoff D. Tappert,* with him *Philip N. Shettig,* for appellant.

*Morton Meyers,* with him *James R. Graham,* of *Graham, Yost & Meyers,* for appellees.

OPINION BY MR. JUSTICE MAXEY, December 5, 1938:
Plaintiff brought a bill in equity to restrain defendants from surrendering certain insurance policies owned

by them on the life of William C. Krieger, and taking the surrender value thereof.

The Chancellor found, inter alia, the following facts: Prior to April 15, 1932, while the Johnstown Trust Company (hereinafter referred to as the trust company) was doing a general banking business, an examination of its assets and liabilities by the Department of Banking of the Commonwealth disclosed an impairment of capital in the sum of $21,182.74. Upon the Secretary of Banking requiring this impairment to be made good as a condition of the trust company's remaining open, John H. Waters, President of the trust company, and owner of much of its stock, made good the impairment by paying the sum above stated to the trust company. At the time of this payment an agreement was entered into between Waters and the trust company regarding certain insurance policies on the life of William C. Krieger, having a face value of $38,660 and a cash surrender value, at that time, of $19,208.96. Krieger was heavily indebted to the trust company and had assigned these policies to it so that it became the absolute owner thereof. The pertinent provisions of the agreement, which forms the basis of this suit, are that, in consideration of the payment of $21,182.74 by Waters, the trust company would pay him "the difference between the face value of the policies and the cash surrender value of the policies, to wit, the sum of $19,451.05, when, as and if the policies are paid on the death of William C. Krieger, the insured." The trust company reserved "the right to surrender at any time the policies . . . and collect the cash surrender value and appropriate the same to its use, free from any claims of John H. Waters under this agreement. Before taking such action, thirty days' written notice of the proposed action shall be given to John H. Waters . . . and he shall have the privilege at any time within thirty days to purchase the policies for such sum as could be realized from the cash surrender value of the policies at that time." The trust company agreed

"to pay the annual premium on the policies amounting to $545.05." It has subsequently paid some of the premiums; others have been paid by policy loans.

The Chancellor also found these facts: The Department of Banking subsequently conducted another examination of the assets and liabilities of the trust company, which disclosed a large additional impairment of capital. In order to make this impairment good, certain directors of the trust company pledged securities owned by them with the Secretary of Banking, under an agreement which is in evidence in this case. John H. Waters pledged securities owned by him of the value of $32,800, under the terms of that agreement. The trust company continued in business until March 6, 1933, the date of the national bank holiday, and remained closed until March 18, 1933, when it reopened under the provisions of the Act of March 8, 1933, P. L. 9, on a restricted basis until June 15, 1934. When it closed on March 4, 1933, and continuously thereafter, the trust company was insolvent. Its assets were insufficient to pay the depositors in full. On that date John H. Waters had on deposit in the trust company the sum of $20,859. It was thus indebted to him in that amount; he was not indebted to it in any amount. During the period the trust company remained open on a restricted basis, a plan of liquidation was evolved for the incorporation of a new bank and trust company, known as Johnstown Bank and Trust Company, and for the appointment of trustees to hold, manage, and liquidate certain assets of The Johnstown Trust Company. Under the plan the assets of the trust company were divided into two groups, one known as "acceptable assets," and the other as "unacceptable assets." The "acceptable assets," representing in value 40% of the deposits of the trust company, were to be turned over to the new bank and trust company. Each depositor of the trust company was to receive 30% of the amount of his deposit in cash from the new bank and trust company, and 10% of the amount of his de-

posit in the form of stock of the new bank and trust company. All the remaining assets of the trust company, known as "unacceptable assets," were to be turned over to seven trustees named in the agreement, to be held, managed and liquidated, and the proceeds used to pay depositors and other creditors until the amounts of their claims were paid in full. Thereafter, if any surplus remained, the directors who pledged their securities for the benefit of the trust company, under the agreement heretofore referred to, were to be repaid the value of the securities pledged to them. Thereafter, the proceeds of the liquidation, if any, were to be distributed to stockholders of the trust company. This plan was approved by the stockholders and by depositors and other creditors in accordance with the Act of May 4, 1933, P. L. 271. Robert S. Waters, administrator of the Estate of John H. Waters, who died on August 14, 1933, accepted the plan without reservation, and later received and accepted from the new bank and trust company 40% of the deposit of $20,859 of John H. Waters in the trust company at the time it closed. Thirty per cent was received in cash and ten per cent in stock of the new bank. In addition, he received and accepted from the trustee-defendants a participation certificate in the sum of $12,515.40, representing 60% of the amount of this deposit, and also a director's participation certificate in the sum of $32,800, representing the value of securities pledged by John H. Waters to help make good the second impairment of the trust company. Prior to the time the reorganization was consummated and in accordance with an authorization so to do by the pledgors, the Secretary of Banking turned over to the trust company, so as to become an asset of it, the securities pledged by its directors.

Included in the "unacceptable assets" turned over to the seven trustees were the insurance policies on the life of William C. Krieger. On September 28, 1935, D. M. S. McFeaters, acting on behalf of the trustee-defendants,

notified in writing those interested in the estate of John H. Waters, of the desire of the trustees to surrender to the respective insurance companies the policies on the life of William C. Krieger (who is still living) and appropriate the proceeds to the use of the trustees, and gave them the privilege of purchasing the policies upon paying to the trustees the cash surrender value of the policies, as provided in the agreement of April 15, 1932. The time limit expressed in the notice was extended by agreement without prejudice to the rights of any of the parties to December 10, 1935. On November 21, 1935, Robert S. Waters, administrator of the Estate of John H. Waters, on behalf of himself, the decedent's heirs, and of the plaintiff, the Hillcrest Foundation, Inc., (a corporation organized for the purpose of liquidating certain assets of the aforementioned estate) tendered to the trustees, the depositor's participation certificate issued to him by the trustees in the amount of $12,515.40, and also the director's participation certificate issued to him in the amount of $32,800, in a total amount equal to the cash surrender value of the insurance policies on the life of William C. Krieger as payment of the purchase price of the policies. This offer was refused by the defendants, who demanded cash, not participation certificates. Thereafter, the plaintiff corporation instituted a bill in equity for an injunction against defendants to restrain them from surrendering these life insurance policies. The conclusions of law set forth, inter alia, that "the defendants have complied with all conditions precedent to the surrender of the policies" and that "the plaintiff may not set off against the amount payable by it, if it chooses to purchase from the defendants the policies for their cash surrender value, either the amounts of the depositor's participation certificate or of the director's participation certificates held by it, or any part thereof."

Plaintiff filed exceptions to some of the findings of fact and all the conclusions of law, and also to the Chan-

cellor's failure and refusal to find certain facts and conclusions of law requested by it. After argument, the court below entered its final decree overruling all exceptions to the adjudication and confirming it absolutely. This appeal followed.

Appellant's first proposition is: "The reservation by the bank of the privilege of avoiding performance, cancelling its agreement and forfeiting the money paid it by John H. Waters by surrendering the life insurance policies and collecting the cash surrender value for its own use, is not supported by a consideration, is inequitable, unreasonable and wanting in mutuality. The supposed right is invalid and not transferable." This proposition must be negatived. It was clearly to the advantage of Waters to enter into the agreement in question, when the trust company of which he was President and a large stockholder was threatened with closing on account of impairment of capital. The agreement was manifestly supported by a consideration. Williston on Contracts (revised edition), Vol. 1, sec. 103C, cites with approval the following quotation from *Finlay v. Swirsky*, 103 Conn. 624, 131 A. 420: "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Williston, in section 115, says: "It is an 'elementary principle that the law will not enter into an inquiry as to the adequacy of the consideration.' This rule is almost as old as the law of consideration itself." This court, in *York Metal & Alloys Co. v. Cyclops Steel Co.*, 280 Pa. 585, 124 A. 752, in an opinion by Justice SADLER, said: " 'There is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not': 13 C. J. 316. 'Refraining from bringing a suit may furnish a consideration. The actual forbearance, or the promise to forbear, to prosecute a claim on which one

has a right to sue is universally held to be a sufficient consideration': 13 C. J. 344." In *Weigand v. Standard Motor Co.,* 109 Pa. Superior Ct. 256, 167 A. 493, that court said: "There may be a consideration without the accrual of any benefit at all to the promisor. If the promisee has suffered any detriment however slight, or though he has suffered no real detriment, if he has done what he was not otherwise bound to do, in return for the promise, he has given a consideration and the court will not ask whether the promisor was benefited. . . . The disadvantage suffered by plaintiff or the benefit derived by defendant was on either phase sufficient consideration for the promise of the defendant motor company." See also *Hind v. Holdship,* 2 Watts 104.

The reason for the reservation of the right on the part of the trust company to surrender the policies at any time and to collect the cash surrender value and to appropriate it to its own use is obvious. The cash surrender value of these policies represented cash whenever the company saw fit to convert them. If they were not readily convertible, they would not have been an available asset, and the impairment in assets would not have been corrected. The contract gave to Waters the option within thirty days after notice, of buying the policies from the trust company for their cash surrender value. In other words, he could have secured the policies which, in the event of the death of the insured, would have yielded him $38,660, by paying the cash surrender value, which was about $20,000. As appellees point out, three things might have happened under this agreement: "(1) If the trust company continued to pay the premiums until Krieger's death and collected the face value of the insurance, Waters would have been entitled to receive from the proceeds of the insurance the sum of $19,451.04. (2) If the trust company elected to surrender the policies and notified Waters of its intention to do so, Waters might have elected to exercise his option to purchase the policies for their cash surrender value. In that

event, by paying approximately $20,000 additional, he would receive insurance that would yield $38,660 on Krieger's death if the premiums were paid. (3) If the trust company elected to surrender the policies and notified Waters of its intention to do so, Waters might have elected not to exercise his option to purchase the policies for their cash surrender value. In that event, the trust company would receive the cash surrender value and Waters would get nothing."

We find no support for appellant's view that this agreement is "shockingly inequitable and lacking consideration and mutuality." Under the circumstances of the case, it was an appropriate contract for both parties to enter into. By entering into this contract, Waters prevented the closing of the bank whose closing would clearly have been to his detriment. Its remaining open was a benefit to him at that time.

Appellant's second proposition is: "If the bank is legally entitled to surrender the policies, appellant is entitled to an equitable set-off against the demand for the cash surrender value in the amount the bank owed John H. Waters on its insolvency." This proposition must also be negatived. When the trust company closed, it was indebted to Waters for the amount of his deposit which was $20,859. If he had been indebted to the trust company at that time, he would have been entitled to a set-off, but the plan of reorganization was accepted by R. S. Waters, administrator of the estate of John H. Waters, without reservation. If Waters had any right of set-off at the time of the trust company's closing, it was a right his estate had the privilege to exercise. His estate cannot accept a dividend of 40% on the full amount of his claim against the bank, and, long afterwards, attempt to use the remaining 60% as an offset. In 1934 Waters' Estate received cash in the sum of $6,-257.70 from the new bank and also received stock from it in the amount of $2,085.90, representing 10% of the deposit. Appellant seeks to use the remaining 60%,

represented by the depositor's participation certificate, as an offset. When the administrator of Waters' Estate accepted the plan without reservation and received a dividend on the full amount of the deposit, he waived the right of offset as to the whole or any part of the deposit. See 4 Remington on Bankruptcy, sec. 1474, page 249, and *Cumberland Glass Mfg. Co. v. De Witt*, 237 U. S. 447. It is not necessary to discuss whether if the estate of the deceased was attempting to set-off the entire deposit and not merely 60% of it, it would be able to do so.

When the trust company closed in 1933, it owed Waters $20,859, the amount of his deposit. If he owed the trust company anything at that time, the doctrine of set-off would apply and mutual debts would have extinguished each other pro tanto. But Waters owed the trust company nothing. What he had was an option to purchase at some future time the Krieger insurance policies for their cash surrender value, after the trust company had notified him of its intention to convert them into cash. The possession of this option did not make him a debtor of the bank *at that time.* Since he owed the trust company nothing when it closed, there was nothing to set-off. "This right of set-off is governed by the state of things existing at the moment of insolvency . . .": 5 Michie, Banks & Banking, sec. 155, pages 292, 293. This court, in *Gordon, Sec. of Banking, v. Anthracite Trust Co.*, 315 Pa. 1, 172 A. 114, held: "The rights of the parties to a set-off were fixed at the time the bank closed: *U. S. Brick Co. v. Middletown Shale Brick Co.*, 228 Pa. 81, 87 [77 A. 395]; *Thacher's Estate*, 311 Pa. 278, 282 [166 A. 873]."

It is also clear that the director's participation certificate of $32,800 cannot be set-off against the claim made. By its express terms it is payable only after depositors are paid in full. It is therefore not yet payable and apparently it is conceded that it never will be.

We do not think it necessary for us to discuss the other questions raised in appellant's brief, for the controlling question is whether or not the plaintiff may set off against the amount payable by it, if it chooses to purchase from the defendants the policies for their cash surrender value, either the amounts of the depositor's participation certificates or of the director's participation certificates held by it, or any part thereof. The court below correctly held adversely to plaintiff's contention. Its findings of fact are well supported and its conclusions of law are sound.

The decree is affirmed at the appellant's cost.