**TMA FUND, INC., a Michigan corporation**

v.

**James BIEVER and Pamela Biever.**

**Civ. A. No. 73–1658.**

United States District Court,
E. D. Pennsylvania.

Aug. 20, 1974.

Gilbert E. Toll, Philadelphia, Pa., for plaintiff.

Harvey Bartle, III, Philadelphia, Pa., for defendants.

## MEMORANDUM

NEWCOMER, District Judge.

The parties to this action have filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The material facts, although not in stipulated form, are established beyond reasonable controversy by affidavits, depositions and the pleadings themselves.

The relevant facts are as follows:

It became evident in January of 1970 that Trans-Michigan Airlines (hereinafter referred to as "Airline"), a commuter airline of which the defendant James Biever was and is a stockholder, needed additional funds in order to operate. However, because of its poor financial condition the Airline was unable to borrow money itself.

As a result, in January, 1970, L. Joseph Crafton, President of the Airline, and several others formed TMA Fund, Inc. a Michigan corporation. TMA Fund, Inc., the plaintiff herein, was formed for the purpose of borrowing money and channeling such monies into the Airline. Defendant James Biever, Joseph Crafton and several others subscribed for stock in TMA Fund, Inc., and James Biever subsequently became the Fund's Vice-President as well as a Director.

On January 19, 1970, plaintiff and Trans-Michigan entered into a loan agreement whereby TMA Fund, Inc. would lend the Airline $400,000 dollars and use its best efforts to obtain an additional $400,000 dollars. The Airlines, in return, gave the plaintiff a long-term note and warrants.

Thereafter, the plaintiff secured credit up to $500,000 dollars from Ann Arbor Bank, but only $375,000 dollars was ever borrowed. In return for the loan from Ann Arbor Bank, the plaintiff Fund by its President Joseph Crafton, signed a note on January 20, 1970, which note was due and payable to the bank on July 20, 1970. Because the plaintiff had no substance of its own, Mr. & Mrs. Crafton, Mr. & Mrs. Biever, Mr. Gerald Buhrman, and Mr. & Mrs. Cedric Fricke signed documents as joint and several guarantors of the bank loan.

By June, 1970, the Airline was in default on its payments to the plaintiff Fund and by July 20, the Airline had instituted bankruptcy proceedings under Chapter XI of the Bankruptcy Act. At

about this time, according to plaintiff's President Joseph Crafton, the plaintiff Fund became obsolete and irrelevant as a vehicle for further investment.

On July 20, 1970, the Ann Arbor Bank renewed the Fund's note for $375,000 dollars but because the Airline was now in a Chapter XI proceeding, the bank began to press for payment of the principal. As a result, Joseph Crafton paid the bank $170,698.54 dollars, thus reducing the principal of the note to $204,301.46.

The July 20 note from the Fund to the bank was renewed in the principal amount of $204,301.46 on October 19, 1970 and again on December 4, 1970. As a result of this latter renewal, the due date for payment of principal was pushed back to February 5, 1971.

On October 26, 1970, defendant James Biever wrote to Joseph Crafton, President of TMA Fund, Inc. in order to resign as an officer and director of the Fund. He also sent a letter to the Airline, resigning as a director of that corporation.

At this point Biever had no more money to invest in these enterprises. Crafton, however, contended that while each guarantor of the Fund's note to the bank was a joint and several guarantor, the guarantors had agreed among themselves that they would be primarily liable for certain portions of the original $375,000 dollar loan: Crafton for $200,000 or 8/15; Biever for $100,000 or 4/15; Buhrman for $50,000 or 2/15; and Fricke for $25,000 or 1/15. This agreement was entered into according to Crafton prior to January 20, 1970, but it was not reduced to writing. Mrs. Biever was not a party to this arrangement.

Because of Biever's inability to pay any additional sums, Crafton decided to fly to Philadelphia to talk with Mr. & Mrs. Biever, the defendants herein. Crafton wanted to discuss Biever's "obligations and to resolve his situation relative to the other guarantors to the bank". Crafton made the trip some time in March and talked with the defendants one evening in their home. Crafton explained to them that he, i.e. the Fund, had obtained a commitment from a group of upstate Michigan businessmen who had agreed to put equity money into the Airlines and that if only the Bievers would rejoin the enterprise by signing the several documents he would present to them related to the TMA Fund, he would be able to consummate the proposal. Funds to be supplied by these businessmen, Crafton told them, would not simply "bridge the problems that the Airline was having" but would "give it enough money to expand and become so profitable that it could very easily pay off the obligations that it had to the TMA Fund". Crafton also told them he "had raised money to go into new routes". He also said he had raised $100,000 in the summer of 1970 and was in the process of raising $200,000 more. According to Crafton, this additional sum was raised by May or June, 1971. However, despite his admitted representations to the Bievers in March, 1971 that he had raised money between July, 1970 and April, 1971 for new airline routes, he conceded at his deposition in this case that during this period "neither Mr. Biever nor I had been successful in finding hope for investors" to obtain any financing for Trans-Michigan Airlines. It was not until April or May, 1971 that he was ". . . able to find some individuals who would provide the temporary financing to keep Trans-Michigan in operation for a period of time and then that financing was provided through Mid-American Airlines . . ."

As a result of Crafton's promises to the Bievers that March evening concerning the Airline and not as a result of any inducement or quid pro quo from TMA Fund, Inc., they both signed an "Agreement of Guarantors to Renewal of Note"—one of the documents that Crafton represented they would have to sign before the upstate Michigan businessmen's investment would be made. Crafton had previously worked out with the Ann Arbor Bank a renewal of the

Fund's $204,301.46 note as of March 1, 1971 but under different terms and conditions than had previously existed. As part of the arrangement the bank required a new guarantee by the original guarantors, and this is what the Bievers signed with Crafton present.

In addition, on March 19, 1971, a few days after the meeting in the Biever home in Philadelphia, Crafton sent the Bievers for their signatures the Agreement and Notes to TMA Fund, which are the subject of this lawsuit. Again, due solely to Crafton's promises about the commitment of the upstate Michigan businessmen to Trans-Michigan Airlines, James and Pamela Biever signed these documents on March 30, 1971. It is undisputed that they did not sign the documents as a result of any inducement or quid pro quo from TMA Fund, the other signatory. The Agreement states:

"WHEREAS, The TMA Fund, Inc. owes the Ann Arbor Bank $204,301.46 evidenced by a Note due and payable on February 5, 1971;

WHEREAS, The TMA Fund has, through its duly authorized officers, executed an installment note, a copy of which is attached hereto, in the amount due;

WHEREAS, Messrs. Buhrman, Crafton, Fricke, and Biever, and their Spouses, are joint and several guarantors of the TMA Fund Note;

WHEREAS, The TMA Fund's only assets are the long term Notes of Trans-Michigan Airlines, Inc., which in the course of Chapter XI Proceedings, has been converted to Preferred Stock;

WHEREAS, Unless and until dividends are paid or such stock is redeemed or sold, there will not be cash inflow to the TMA Fund, Inc. and the guarantors will, therefore, have to supply the funds necessary to pay the Bank; and

WHEREAS, We agree with the actions taken and recited above and wish to formalize our obligation to the TMA Fund, Inc.;

IT IS AGREED THAT:

1. We shall execute and deliver a Note in the principal amount of $54,424.00, bearing interest at 2% over the Ann Arbor Bank's prime rate, with principal repayable at the rate of 2% per month, beginning April 1, 1973 until the balance is paid.

2. We shall execute and deliver another Note in the amount of $51,104.-00, representing $\frac{4}{15}$ of the interest and principal already paid by the TMA Fund, Inc. in excess of interest received from TMA, bearing interest at 7% per annum, with interest and principal due and payable on July 1, 1972.

3. The TMA Fund agrees that all interest and principal payments received from the Bievers will be applied first, to interest owing the Ann Arbor Bank; second, reduction of the $204,301.46 owing the Ann Arbor Bank; and third, reimbursement of Buhrman, Crafton and/or Fricke for interest and/or principal payments to the Ann Arbor Bank from their funds in excess of their obligations of $\frac{2}{15}$, $\frac{8}{15}$ and $\frac{1}{15}$ respectively."

TMA FUND, INC.

By  /s/ L. Joseph Crafton

Its President

/s/ James  Biever  3/30/71
James Biever  Date

/s/ Pamela  Biever  3/30/71
Pamela Biever  Date

The two separate and undated Notes, which the Bievers signed provided:

"NOTE

James and Pamela Biever, jointly, promise to pay to the order of the TMA Fund, Inc., a Michigan corporation, $51,104.00 on July 1, 1972; and at maturity, pay interest at the rate of 7% per annum.

"This Note is issued subject to an Agreement between the makers and the payee entered into in March 1971.

/s/ James Biever
James Biever

/s/ Pamela Biever
Pamela Biever

"NOTE

James and Pamela Biever, jointly, promise to pay to the order of the TMA Fund, Inc., a Michigan corporation, $54,424.00, such principal to be paid in installments of $1,088.48 per month on April 1, 1971 through March 1, 1972; $1,632.72 on April 1, 1972 through March 1, 1973; and $1,904.84 on April 1, 1973 until the full amount of principal is paid, and with interest on the unpaid balance, monthly, at the rate of 2% over the prime rate as established by the Ann Arbor Bank.

"This Note is issued subject to an Agreement between the makers and the payee entered into in March 1971.

/s/ James Biever
James Biever

/s/ Pamela Biever
Pamela Biever"

After the meeting in Philadelphia, Crafton called Biever several times to advise him that the arrangements with the alleged investors had not been finalized but that the bank wanted some interest payment. Biever sent him a check for the amount Crafton requested. Several days later Crafton called again and related the same facts. The Bievers made two payments totaling $2,788.48.

Some time in May, 1971 or a little later Mrs. Biever spoke to Crafton by phone and told him that they were having a difficult time making payments.

The alleged commitment from the upstate Michigan businessmen failed to materialize.

DISCUSSION

First, the plaintiff is a Michigan corporation having its principal place of business in the State of Michigan. The defendants are individuals, husband and wife, residing at 729 Waverly Road, Bryn Mawr, Pennsylvania. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000. We have jurisdiction over the parties and the subject matter of this action. Both sides apparently concede that Pennsylvania law applies.

Plaintiff TMA Fund, Inc. is suing defendants on two promissory notes which were executed on March 19, 1971 in conjunction with an Agreement which was also signed on that date. The two notes are both the joint obligations of defendants James and Pamela Biever as makers. Also, both of the notes in controversy were issued subject to the Agreement of the same date between the defendant makers and the payee plaintiff TMA Fund, Inc.

Before we can enter summary judgment for either party, we must determine that there is no genuine issue of material fact outstanding which relates to the enforceability or validity of the two notes in question.

■ Defendant has raised several issues which are ancillary, we feel, to the basic problem of whether or not there was or is any consideration supporting the issuance of these two notes. One is the issue of fraud and the other is whether or not plaintiff TMA Fund, Inc. can sue in this court without having first obtained a Certificate of Authority pursuant to 15 P.S. § 2001. We will assume that there was no fraud or misrepresentation on the part of Joseph Crafton for purposes of these summary judg-

ment motions in order to confront what appears to be the heart of the controversy between the parties. We also are of the opinion that the isolated nature of the transaction involved in this case falls within the enumerated exceptions of section 2001 and that plaintiff can maintain its suit in this Court.

■ First, we must discuss plaintiff's contention that these two notes are negotiable instruments within the definition set forth in Article 3 of the Uniform Commercial Code. Pa.Stat.Ann. tit. 12A § 3–104 requires, inter alia, that any writing to be a negotiable instrument must "contain an unconditional promise or order to pay a sum certain in money . . ." Section 3–105 of tit. 12A provides that a promise or order is not unconditional if the instrument "states that it is subject to or governed by any other agreement." The two notes in question were both issued subject to the March 19, 1971 Agreement and are therefore not negotiable instruments within the meaning of Article 3 of the Uniform Commercial Code. Therefore, Section 3–408, which provides ". . . that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind . . ." does not apply to the transaction involved herein. We must therefore apply the common law of Pennsylvania as it relates to the issuance of the notes in question to determine whether or not there was valid consideration to support their issuance.

■■ Under the law of Pennsylvania, in order for a contract to exist at all, there must be sufficient consideration to support it. See Stelmack v. Glen Alden Coal Co., 339 Pa. 410, 14 A.2d 127 (1940). Consideration is defined as a benefit to the party promising or a loss or detriment to the party to whom the promise is made, see Hillcrest Foundation, Inc. v. McFeaters, 332 Pa. 497, 2 A.2d 775, as long as the promisee in return for the promise does anything legal which he is not bound to do or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not. See York Metal and Alloys Co. v. Cyclops Steel Co., 280 Pa. 585, 124 A. 752 (1924).

"It is not enough, however that the promisee has suffered a legal detriment at the request of the promisor. The detriment incurred must be the 'quid pro quo', or the 'price' of the promise, and the inducement for which it was made".[1]

Defendants argue that although they suffered a loss or detriment by agreeing to pay TMA Fund, Inc. in excess of $105,000 dollars, they received or would have received nothing in return from plaintiff for their promise to do so. Plaintiff argues that the benefit to defendants was the possibility that new money from the upstate Michigan businessmen might be forthcoming.

An examination of the March 19, 1971 agreement and notes does not disclose that the plaintiff Fund was bound to do anything in return for the payment of the notes. The execution of those notes was induced by Crafton's promise of future money from a third source for the benefit of the Fund. Keeping the Airline afloat would have definitely benefited James Biever because he was a stockholder in the corporation and any monies obtained by plaintiff Fund would go to the Airline or to the Ann Arbor Bank as repayment of the Fund's outstanding note.

The actual act of executing the two notes by the Bievers appeared to be a final pre-condition to the Fund's obtaining additional capital from the upstate businessmen. The Crafton promise was in the nature of a conditional promise but a promise which he had no power to make at that time. The promise to supply additional capital was the promise of the upstate businessmen and not that of the Fund. Crafton appeared to be acting as a go-between for the businessmen

---

1. Stelmack v. Glen Alden Coal Co., 339 Pa. 410, 14 A.2d 127 (1940).

and the Fund but was also acting in his own interest because he obviously would benefit as President of the Fund and principal stockholder in the Airline if he could obtain additional capital for the Fund.

 There is little question that the Bievers would not now be able to sue plaintiff TMA Fund, Inc. for damages for breach of contract in failing to obtain the necessary commitments from the upstate businessmen because the Fund did not agree to do anything when the agreement and notes were executed in return for the payment on the notes. TMA Fund is to this day not required to do anything or to refrain from doing any act which it had a right to do under the terms of the purported agreement. For this reason we agree with defendants that there is no consideration supporting the issuance of the two notes in question and that the notes are therefore unenforceable in a court of law.

Likewise, these two notes are not supported by a moral consideration because plaintiff Fund has pointed to no pre-existing obligation on the part of the Bievers which for one reason or another has become inoperative. It is conceivable that the prior oral agreement of the Bievers to be primarily liable for 4/15 of the original loan of $375,000 would have constituted a pre-existing obligation to the Fund if supported by an antecedent valuable consideration, and that such obligation could support the issuance of these two notes. See Stebbins v. County of Crawford, 92 Pa. 289 (1879). But plaintiff has not proceeded upon this theory and so has not made out its case with respect thereto.

But even if we were to find that the "promise" by Crafton to obtain additional capital from third parties was sufficient consideration, the fact that he did not do so constitutes a failure of consideration on the part of the Fund. The notes are as unenforceable in this situation as they are where no consideration exists from the outset. The consideration failed to materialize because of Crafton's inability to keep his end of the "bargain" and not because of any action or failure to act on the part of defendants.

We will therefore enter summary judgment in favor of defendants and against plaintiff for the reasons set forth above.