**KARAVEL SHIPPING CORPORATION OF MONROVIA**

v.

**SUN INTERNATIONAL, LTD.**

Civ. A. No. 80–2137.

United States District Court,
E. D. Pennsylvania.

Sept. 17, 1982.

Dante Mattioni, Mattioni, Mattioni & Mattioni, Philadelphia, Pa., for Karavel Shipping Corp. of Monrovia.

Peter F. Marvin, Miller, Schreiber & Sloan, Philadelphia, Pa., for Sun Intern.

## MEMORANDUM AND ORDER

GILES, District Judge.

Karavel Shipping Corporation ("Karavel"), the owner and operator of a vessel, and

Sun International Ltd. ("Sun"), a charterer, were parties to a transport agreement dated July 1979 for the importation of oil from certain Caribbean ports to certain ports in the Northeast United States. Two disputes pertaining to the discharge of cargo have arisen between the parties. The first focuses on whether under the written agreement, Big Stone Beach Anchorage in Lewes, Delaware, was a separate port for payment purposes or solely a lightering point. The second dispute is over whether Karavel's delay in submitting its demurrage claim was excusable neglect or willful so as to be precluded by the terms of the charter agreement. Karavel has moved for summary judgment on both liability issues. Sun has moved for partial summary judgment as to the demurrage claim.

 Under Rule 56(c) of the Fed.R. Civ.P., a motion for summary judgment will be granted only if there is no genuine issue of material fact, thus entitling the moving party to a judgment as a matter of law. The moving party has the burden of showing the lack of a genuine factual issue and the pleadings are to be construed and inferences drawn in favor of the non-moving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir. 1981); *Lynn v. Heyl and Patterson, Inc.*, 483 F.Supp. 1247, 1250 (W.D.Pa.1980) *aff'd* 636 F.2d 1209 (3d Cir. 1980).

## I. *Findings of Fact*

The parties agree upon the following relevant facts:

1. Alpaca Shipping Corporation, Inc. ("Alpaca") was the Manager of the S.T. Arctic Star on behalf of Karavel.

2. Sun International, Ltd. is the successor by reason of name change to Sun Oil Trading, Ltd.

3. The voyage charter agreement was on a Asbatankvoy Tanker Voyage Party Form (this form is identical to the Exxon 1969 Tanker Voyage Party Form) with the inclusion, at Sun's request, of the following Sun standard clauses:

Lightering
Demurrage
Diversion
Safe Berth
Bill of Lading

4. Paragraph C of the voyage charter agreement provided:

*Loading Port(s)*

One or two safe port(s) Caribbean Sea excluding Orinico River but first port to be Columbian Port on Atlantic side of Columbia. It is understood if only one port used then port shall be Columbian Port.

5. Paragraph D of the voyage charter agreement provided:

*Discharging Port(s)*

One or two safe port(s) U.S. Atlantic Coast if New York, not north of the George Washington Bridge excluding Florida or one or two U.S. Gulf excluding Florida.

6. The Sun Diversion Clause provided:

*Sun Diversion Clause:* Notwithstanding anything else to the contrary in this Charter Party and notwithstanding what loading and/or discharging ports may have been nominated and bills of lading issued, Charterer shall have the right to change its nomination of the loading and/or discharging ports in accordance with Part I C&D of the Charter. Any extra time and expense incurred by Owner in complying with Charterer's orders shall be for Charterer's account and calculated in accordance with Part II, Clause 4(c) of this Charter. Freight is based on the voyage actually performed. Charterer shall have the right to make as many changes as it deems necessary.

7. The Sun Lightering clause provided:

*Sun Lightering Clause:* If lightering is required to berth at a discharge port, it may be necessary to lighter the vessel while anchored at anchorage. Laytime at anchorage (whether or not the vessel is on demurrage) shall begin six (6) hours after receipt of Notice of Readiness by Charterers or when first lighter barge

arrives alongside, whichever occurs first, and shall end when vessel weighs anchor to proceed to a berth. Laytime shall begin again upon the vessel's arrival in berth (i.e., all fast at the discharging wharf). Although the time used in such lightering shall count as laytime, such anchorage shall not be considered a second discharge port or second discharge berth and running time from anchorage to such discharge port or berth shall not count as laytime (whether or not the vessel is on demurrage).

8. Pursuant to the voyage charter agreement Sun had the right to, and did, select and designate all loading and discharge ports.

9. During the voyage Karavel operated the S.T. Arctic Star under the instructions, directions, and orders of Sun insofar as the loading ports, the terminals from which cargo would be received, the quality of the cargo, the quantity of cargo and the discharge ports and terminals including whether cargo would be lightered.

10. Pursuant to the terms of the voyage charter agreement, the vessel loaded a cargo of approximately 55,000 metric tons at Columbia and Aruba.

11. On August 2, 1979, Sun sent a telex, the pertinent part of which states:

Confirming our telecon at 1100 hours today, subject vessel is to proceed to Marcus Hook Anchorage, Marcus Hook, Pennsylvania to lighter maximum 200,000 barrels 1.98 sulphur residual fuel oil loaded at Aruba. Cargo to be lightered is to be taken only from wing tanks No's 1, 2, 4, 6, port and starboard and center tanks No's 1, 3, 5.

12. On August 3, 1979, Sun sent the following telex:

Confirming verbal orders this date. Subject vessel is to proceed to Big Stone Anchorage lightering 50,000 bbls. Then shift to Marcus Hook Anchorage Lightering on additional 150,000 bbls. (a total of 200,000 bbls. to be lightered for Swann's account in the Philadelphia Harbor). The 100,000 bbls. will be lightered per instructions sent to you under telex dated August 2, 1979.

Vessel is then to proceed to Piney Point, Maryland to Stewarts Terminal to discharge remaining cargo, approximately 150,000 bbls. agents at Piney Point, Maryland will be Ramsey-Scarlett.

13. The S.T. Arctic Star followed Sun's directions and discharged cargo at Big Stone Beach Anchorage, Delaware, Marcus Hook Anchorage, Pennsylvania, and Piney Point, Maryland.

14. All cargo was discharged by August 11, 1979 at 0540 hours when the hoses were disconnected at Piney Point, Maryland.

15. Upon receipt of final sailing instructions for the S.T. Arctic Star, on or about August 5, 1979, the owners prepared their statement for freight.

16. Part I, Paragraph F, of the charter provided the method of calculating freight as follows:

F. *Freight Rate:*

World Scale Two Hundred Fifty (WS250) per ton (of 2,240 lbs. each)

The Sun Diversion Clause and other parts of the charter made clear that freight was payable on the actual voyage performed.

17. In July and August 1979, Big Stone Beach Anchorage was specifically listed as a separate port for the determination of World Scale rates as were Marcus Hook, Pennsylvania and Piney Point, Maryland.

18. L. Q. M. Associates, Inc. was the charter broker used by Sun to make or fix the voyage charter agreement and Fearnley & Egers, Inc. was the charter broker used by Karavel.

19. World Scale is an association of ship brokers that determine the base rates applicable from one location to another and is utilized worldwide by vessel owners and ship charterers.

20. In denying Karavel's claim for a three port discharge based upon the World Scale rates, which listed Big Stone Anchorage as a port, Sun did not consult with L. Q. M. Associates, Inc., but rather interpreted the Sun lightering clause to limit payment to two ports, to the exclusion of Big Stone

Beach Anchorage. (Deposition, Robert J. Grasso, N.T. 30–35).

21. Big Stone Beach Anchorage was not designated as a place for the vessel to go as of the date of fixture of the charter agreement between the brokers. (Deposition, Robert J. Grasso, N.T. 36).

22. On August 6, 1979, in the ordinary course of business, L. Q. M. Associates, Inc. forwarded a statement to Sun for ocean freight on the cargo in the amount of $665,-808.74.

23. The statement was based upon World Scale rates for two loading ports and three discharge ports.

24. Upon receipt of the ocean freight statement, Sun recalculated it based upon World Scale rates for two discharge ports and forwarded the sum of $652,023.88 to the vessel owner.

25. By telex of September 26, 1979 the owner requested Sun to remit $13,784.86 or the balance of freight due for a three port discharge.

26. Sun replied by telex dated September 26, 1979:

> In our calculation of freight rate charterers note that owners have charged us two port loading—three port discharge. That is Mamonal, Aruba to Big Stone, Marcus Hook and Piney Point. By acceptance of the Sun lightering clause charterer does not consider Big Stone Beach Anchorage chargeable as a port in rate. Charterers base their calculation on two port loading—two port discharge. Mamonal and Aruba to Philadelphia and Piney Point. We realize shifting charges may occur.

27. By telex of October 9, 1979, the owner advised Sun that under World Scale rates Big Stone Beach Anchorage was a separate port and requested Sun to pay the additional freight.

28. By telex of November 6, 1979, the owner again requested that Fearnley & Egers, Inc. advise them of the status of the outstanding freight.

29. Should the voyage be considered to have three discharge ports, the owner is entitled to additional freight in the sum of $13,784.86.

30. Should the voyage be considered to have two discharge ports, the owner is entitled to shifting expenses computed as follows:

| | |
|---|---|
| Extra Agency fee and mileage at Big Stone Beach Anchorage | $ 150.00 |
| Launch Service at Big Stone Beach Anchorage | 85.00 |
| Additional Pilotage re shifting expense | 2,242.97 (subject to verification) |
| Additional Overtime | 500.00 |

Furthermore, there is additional demurrage if the voyage is a two rather than three port discharge.

31. Pursuant to Paragraph H of the charter party the total laytime available for both loading and unloading was seventy-two (72) hours. Thereafter demurrage would accrue.

32. The amount the charterer would be obligated to pay for demurrage would vary depending on whether Big Stone Beach Anchorage was considered a separate port or not.

33. The hours expended in loading, discharging and shifting are reflected in the demurrage statement forwarded to Sun on February 1, 1980.

34. The Sun Standard Demurrage Clause provides:

> "Owners agree that in order to be honored, any demurrage claims incurred under this Charter Party are to be submitted with supporting documents to Charterers within five (5) months of completion of discharge."

35. On or about October 5, 1979 Alpaca, on behalf of the owner, forwarded to Fearnley & Egers, Inc. the demurrage statement based on a three port discharge which was identical in all respects to that forwarded by Fearnley & Egers, Inc. to Sun by letter of February 1, 1980.

36. On or about October 5, 1980, Fearnley & Egers, Inc. was asked by the vessel owner to retain the demurrage statement

as the number of discharge ports was in dispute and the owner was making an effort to have Sun agree to a three port discharge.

37. On January 30, 1980, Alpaca forwarded to Sun a telex that stated:

Owners have experienced extreme difficulties in obtaining time sheet and other documents from the loadport Mamonal Columbia. However, same have just been received.

Also in view of the fact that no answer has been received from charterers concerning outstanding claim for balance of freight amounting to US DLRS 13,784.86, owners are unable to proceed with the demurrage claim under the above Charter Party.

Therefore, pls request charterers to revert regarding balance of freight and also kindly request them to grant a 30 day extension to the time bar thereby enabling owners to present their demurrage claim in due course.

38. The owner forwarded its demurrage statement to Sun by letter of February 1, 1980.

39. Sun replied on February 7, 1980, stating that it still maintained the voyage was one of two discharge ports rather than the three claimed by the owner.

40. Thereafter, Sun reaffirmed its position that the voyage involved two discharge ports and also refused to pay the demurrage claims alleging it was time barred.

41. On February 6, 1980, Sun forwarded to the owners the following telex:

In response to owners request for charterers to grant a thirty day extension on demurrage time bar, charterers regret that we are unable to provide extension and that owners are requested to make every effort to provide said claim within five months of discharge. However, should owners submit claim beyond the five month period and Sun is able to collect demurrage and are not subsequently time barred by the customer, then Sun will make every effort to honor owners claim pending collection of their own.

Ref: Balance of freight of DLRS. 13,748.-86.

The reduction from freight stems from disagreement on base worldscale rate.

42. None of Sun's receivers raised a time bar question and Sun lost no money as a result of its failure to receive the demurrage statement within five months.

43. On January 29, 1980 Alpaca sent to Fearnley & Egers a telex which stated in pertinent part:

"Please advise status of following: Arctic Star Voy 59 CP20thJul79 Sun Oil Demurrage US Dollars 77,771,77"

44. On February 6, 1980, Stacy Evans, an employee of Sun sent to Robert Grasso, a fellow employee, a memo that stated as follows:

"Please advise owners if Sun is able to collect demurrage and we are not time barred. We will not time bar owners. Sun will do best to collect."

45. The letter transmitting the demurrage claim to Sun, dated February 1, 1980 from Fearnley & Egers, Inc. stated: "The owners regret same has been somewhat delayed, which is due to document problems."

## II. *Discussion*

Sun erroneously contends that its standard lightering clause controls the transaction to the extent that the court should ignore the clear and unambiguous language of the voyage charter agreement that freight was determined in accordance with the rates established by internationally recognized World Scale Association. It is undisputed that the World Scale rates, at all times material to this action, listed Big Stone Beach Anchorage as a separate port for freight rate computation. It had been so listed since January 1, 1974. *See In the Matter of Arbitration, Overseas Brelktank Corporation and World Wide Transport, Inc.*, Society of Maritime Arbitrators, Decision No. 1049 (1976). Sun's knowledge of this at the time of the agreement is irrelevant since it bound itself through the charter broker who fixed the agreement at the World Scale rate. When the agreement

became binding neither the vessel owner nor the charterer knew for certain that the final vessel passage would include Big Stone Beach Anchorage. However, Sun is held to have known that that discharge port was scheduled for separate computation under the World Scale regulations. That Sun originally contracted for a two port discharge is of no consequence since it later changed the requirement to include a third port and Karavel performed delivery of the cargo requested. Nothing in the lightering clause restricts or limits the normal construction which would be given the phrase a "discharge port" under the World Scale rates. Since there is no question of both parties' intent to be bound by prevailing World Scale rates, evidence as to the past lightering history at Big Stone Beach Anchorage is irrelevant to a strict application of the Freight Rate clause. Therefore, Sun was obligated to treat Big Stone Beach Anchorage as a separate discharge port and breached the voyage charter agreement when it refused to pay according to established and published World Scale rates.

Sun argues that Karavel should have understood the lightering clause to exclude Big Stone Beach Anchorage as a discharge port. However, when read in conjunction with the Freight Clause, there is nothing in the lightering clause to support this contention. The lightering clause signifies that there will be no payment for lightering at an anchorage. However, Big Stone Beach Anchorage is, according to the World Scale schedule, a separate discharge port for payment purposes. Therefore, the lightering clause must be read in harmony with the Freight Clause and the two clauses are wholly consistent.

For these reasons, the vessel owner's motion for summary judgment shall be granted as to the cargo freight claim.

As to the demurrage claim, the motion for summary judgment must also be granted. Sun asserts that Karavel through its managing agent, Alpaca, misrepresented the reason for requesting a thirty day extension to the five month time bar for submission of the demurrage claim. There-

fore, it should be precluded from invoking any equitable doctrines of excuse and avoidance. *Restatement of Contracts,* § 357(1)(a) (1932). According to the deposition of Mr. Palasis, the director of Alpaca, a complete, fully documented demurrage claim had been prepared and transmitted to the charter broker by October 5, 1979 for forwarding to Sun. On January 30, 1980, Alpaca telexed Sun that an extension was necessary because receipt of documentation from loadport, Mamonal Columbia, was delayed. Sun contends, however, that the real reason for the delay was the direction from Karavel not to forward the demurrage claim because of the ongoing dispute as to whether there was a two or three discharge port freight claim.

Sun's contention of willful misrepresentation must be rejected because there was disclosure in the January 30, 1980 telex that one of the reasons for not submitting the demurrage claim timely and requesting an extension was Sun's discharge port dispute. It stated, in part:

> "Also in view of fact that no answer has been received from charterers concerning outstanding claim for balance of freight amounting to U.S. DLRS 13,784.86 owners are unable to proceed with the demurrage claim under the Charter Party."

With this knowledge Sun agreed to honor the demurrage claim of Karavel, even though submitted late, to the extent that Sun was able to collect the demurrage from its receivers and was not time barred. None of Sun's receivers raised a time bar and Sun lost no money by reason of the demurrage claim delay of less than a month. Sun's promise supported by the consideration of the vessel owner's performance to so honor the belated demurrage was an extension of the voyage charter agreement's time bar provision and is enforceable. *Restatement (Second) of Contracts,* §§ 82, 84 (1979); *TMA Fund, Inc. v. Biever,* 380 F.Supp. 1248, 1254 (E.D.Pa.1974); *Stebbins v. The County of Crawford,* 92 Pa. 289, 292–93 (1879). Here, there was a recognized dispute as to the number of discharge ports, the resolution of which was necessary

in order to compute the final demurrage claim.

Karavel had earned the demurrage based upon a three port discharge rate. Plaintiff's contention that its substantial performance should be found to excuse any non-performance with respect to the demurrage clause under *Restatement (Second) of Contracts* § 229 (1979), appears inappropriate. That section is limited to situations where occurrence of the condition was not a material part of the exchange. Here, there is a genuine dispute as to the materiality of the time bar, since Sun's receivers had the right to raise time bar defenses against Sun.

Defendant's arguments with respect to preclusion of equitable doctrines of excuse and avoidance due to plaintiff's alleged willful failure to submit a timely claim are misplaced and need not be addressed. Sun made a new promise to pay, which in effect was simply an undertaking to make a good faith effort to collect plaintiff's claim of demurrage from Sun's receivers. It apparently did so without suffering any monetary prejudice.

Karavel is entitled to (1) demurrage based in accordance with Sun's February 6, 1980 telex, (2) cargo freight in the amount of $13,748.86, plus interest and (3) attorney's fees. A hearing shall be held for assessment of damages.