Martin, Appellant, *v.* Pennsylvania Turnpike Commission.

68

Argued January 13, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*J. Marlin Shreiner,* for appellant.

*K. L. Shirk, Sr.,* with him *Shirk & Shirk,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 14, 1955:

Christian R. Martin is a farmer who, on April 12, 1948, owned and possessed, in Brecknock and East

Cocalico Townships, Lancaster County, 58½ acres of land. On the day mentioned, the Pennsylvania Turnpike Commission, extending its super-highway through the State, condemned 9 acres of Mr. Martin's farm and later offered him $3500 for a quitclaim deed to the land taken. On February 26, 1952, Martin received in the mail from the Turnpike Commission an option agreement providing for the payment of $3500 for the condemned parcel of land.

Fearing that he might suffer future damages because of the fact that the turnpike right-of-way encroached on land occupied by his farm, Mr. Martin inserted into the agreement the following provision: "UNDER AND SUBJECT TO: That the Pennsylvania Turnpike Commission shall be liable to the said Christian Martin, his heirs and assigns, for any and all damages that may arise or be incurred hereafter to the barn built on the herein and above described premises, due to the fact that said barn as it now stands overlaps the Right-of-Way of the Pennsylvania Turnpike Commission by *Two Inches* on the Southwest corner thereof and *Five Feet* on the Southeast corner thereof." He then affixed his signature to the paper and returned it to the Commission, where on March 17, 1952, it was apparently routinely signed without anyone noting the condition added by the property-owner. Several days later someone did discover the insertion and on March 27, 1952, Harry C. Pepper, Chief Counsel of Right-of-Way Division, wrote Martin, inter alia, as follows: "Enclosed herewith are two agreements of the Pennsylvania Turnpike Commission to be executed and acknowledged by you. The agreements which were executed by you prior to this were not acceptable to the Commission due to the fact that reservations added to the agreement were not the same used by the Commission in such cases. Therefore, we have added a reserva-

tion of our own to the second page of these agreements, and we shall complete final settlement as quickly as possible."

Mr. Martin did not sign this second agreement nor any other agreement. Some communications were exchanged between the Commission and Mr. Martin, but no mutually satisfactory accord resulted from these negotiations. On November 27, 1953, the Commission petitioned the Court of Common Pleas of Lancaster County to pay into Court the sum of $3500 for the purpose of settlement with Martin. A rule issued on him to show cause why the money should not be paid. Martin filed an Answer to the Petition, depositions were taken, and on May 14, 1954, the court made the rule absolute, holding that Martin was compelled to accept the proferred $3500 and convey title to the condemned 9 acres to the Commission.

The learned court below erred in its appraisement of the facts and the application of the law to those facts. When Martin inserted a condition into the agreement of February 26, 1952, he in effect wrote a new contract. When the Commission on March 27, 1952, rejected Martin's condition, the agreement of February 26, 1952 ceased to exist as a binding contract. As the Supreme Court of the United States said in the case of *Minneapolis and St. Louis Railway v. Columbus Rolling Mill*, 119 U. S. 149: ". . . an offer to sell imposes no obligation until it is accepted according to its terms. So long as the offer has been neither accepted nor rejected, the negotiation remains open, and imposes no obligation upon either party; the one may decline to accept, or the other may withdraw his offer; and either rejection or withdrawal leaves the matter as if no offer had ever been made. A proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer,

and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it." This logical, just, and self-assertive doctrine was affirmed by our Court in *Henry v. Black*, 213 Pa. 620, 627.

In granting the rule against Martin the court below said that "a rescission of a contract must be based on a sufficient consideration." But this is a superstructure built on a phantom foundation. There never was a contract here to rescind. "Nothing is better settled than that in order to constitute a contract there must be an offer on one side and an unconditional acceptance on the other. So long as any condition is not acceded to by both parties to the contract, the dealings are mere negotiations and may be terminated at any time by either party while they are pending. There must be a meeting of minds in order to constitute a contract. This doctrine is very familiar and has been recognized many times in our Courts." (*Rich v. Pifer*, 100 Pa. Superior Ct. 483, 487.)

From the moment that Martin, on February 26, 1952, counter-offered with a proposition that would safeguard his barn against encroachment, he declined the Commission's offer of settlement. In all the months that followed this breach of February 26, 1952, there was never a time that Martin's mind and the mind of the Commission met in complete harmony. The formation of a contract is like two bridge spans moving from opposite sides to a junction midstream. Unless and until the spans meet perfectly there is no bridge.

The lower court speaks of a "complete and executed agreement" as of February 26, 1952. This is error, as is the statement made by the Commission in its Petition, paragraph 16, where, after asserting that it had

issued a check to Martin, dated March 20, 1952, in the sum of $3500, it averred that "it has been ready and willing to settle with the Plaintiff [Martin] at all times, since the said date of March 20, 1952." It could not have been ready and willing to settle *from March 20, 1952,* because, only a week later, on March 27, 1952, the Commission refused to accept Martin's offer with regard to the property which the Commission wished to purchase from him. Even seven months after this, Martin was still seeking an agreement with the Commission. He wrote on October 13, 1952, asking for a meeting "when matters can be discussed face to face." J. W. Gehr, Justice of the Peace before whom the first agreement was signed, testified: "The Turnpike wouldn't make any concessions and Mr. Martin wouldn't either."

The fact that the Commission may have at one time seemed disposed to accept Mr. Martin's condition after having on March 27, 1952, categorically rejected it would not revive the contract unless Martin accepted the re-offer. That he was the original proposer of the condition would not make his acceptance automatic; the Commission had withdrawn all life from the proposal on March 27th. The bridge-spans of a mutual understanding had to be re-erected and meet again because, with the action of the Commission on March 27th, both spans fell and disassembled. However, aside from this, there is no definitive evidence that the Commission ever decided to do what the lower court assumed it did. The Court of Common Pleas says in its Opinion that the Commission offered "to pay the $3500.00 as damages to the plaintiff with the clause as to the barn in it, as originally agreed to by the plaintiff, or, in the alternative, of paying $500.00 additional with the clause as to liability for damage to barn eliminated." This statement is not borne out

by the record. The last letter written by the attorney and agent for the Commission to Mr. Martin (December 23, 1952), reads as follows:

"Dear Mr. Martin:

I have received from the turnpike commission, check for $3500 for the purpose of settlement with you.

I had previously been advised that they are going to settle either with the clause that you desire inserted and pay you $3500, or $4,000 without this clause being inserted. I am again writing to him about this, *so that they can let me know what they wish to do about it.*

Yours very truly,

SHIRK & SHIRK

BY: (s) K. L. Shirk Sr."

(Emphasis supplied.) The last sentence of this letter shows that the Commission's end of the bridge was still not off the ground. It needs no citation of authority to establish that no one can be held to a supposed agreement when the offeror's representative still has to be let known what "they [the offeror] wishes to do about it."

The lower court speaks of an offer made to Martin to pay him $3500 with the provision about the farm or $4000 without the provision. But J. M. Reilly, official contact man for the Commission and who called on Martin in an attempt to work out a settlement, testified that he made no agreement with Martin for an additional check of $500 with or without the provision about the farm.

On September 23, 1952, K. L. Shirk, attorney and agent for the Commission, informed Martin that he had in his possession a check for $3500 and a deed. He ended his letter with the significant words: "Of course, *if a settlement cannot be had,* I should return this deed and check and the matter would then be one for con-

demnation proceeding, by viewers." (Emphasis supplied.) This certainly negatives the concept of a binding agreement between the parties.

On February 26, 1954, Martin presented a petition for the appointment of viewers to assess damages caused by the condemnation of certain parts of his farm for the construction of the Pennsylvania turnpike. It appears that in addition to the actual loss of 8 acres and the interference with the use of his barn, he may suffer further damages because of the severance and isolation of 27 other acres.

The Constitution of Pennsylvania guarantees just compensation for land taken under eminent domain proceedings. It does not appear that, under the procedure followed to this point, Martin has as yet had an opportunity to present his case as to what is the just compensation he is entitled to.

The order of the court below is reversed and the case is remanded to allow a Board of Viewers to assess such damages as are meet and proper.