**In re Louis J. BELTRAMI, Debtor.**

**Joseph R. Beltrami, Plaintiff,**

**v.**

**Louis J. Beltrami, Defendant.**

**Bankruptcy No. 5–92–bk–01195.**
**Adversary No. 5–01–ap–00217.**

United States Bankruptcy Court,
M.D. Pennsylvania.

April 7, 2005.

Abraham B. Cardenas, York, PA, for Debtor.

## OPINION[1]

JOHN J. THOMAS, Chief Judge.

Currently before this Court is an adversary proceeding—in both the legal and social sense—concerning the existence of a contractual agreement between two brothers. For the reasons articulated below, this Court grants judgment, in part, in favor of Joseph.

### PROCEDURAL HISTORY

Defendant Louis J. Beltrami ("Louis") voluntarily filed a chapter 11 petition on July 2, 1992. On April 18, 1994, Plaintiff Joseph R. Beltrami ("Joseph") filed an unsecured priority proof of claim and supporting documentation. *See* Claim 7. Louis filed an objection to Joseph's claim on December 7, 1998. *See* Docket 5–92–bk–01195 at NIBS Doc. 200. This objection was later amended on April 4, 2001. *See* Docket 5–92–bk–001195 at Doc. 158. Joseph filed his answer on May 1, 2001. *See id.* at Doc. 160.

Louis filed an amended plan of reorganization on June 1, 2001, which drew an objection from Joseph. *See id.* at Doc. 167 & 171. The plan classified Joseph's claim as a Class 6 disputed and unliquidated claim and proposed the creation of an appropriate reserve to satisfy this claim in the event it became allowed. *See id.* at 167 at ¶ 3.6.

This Court entered an Order on June 26, 2001 sustaining Louis' objection to Joseph's proof of claim. *See id.* at Doc. 177. An Order confirming Louis' plan of reorganization was executed on June 29, 2001. *See id.* at Doc. 180.

Joseph filed the instant complaint against Louis on August 27, 2001. *See* Docket 5–01–ap–00217 at Doc. 1. Louis filed an answer on April 19, 2002 and the matter was scheduled for trial. *See id.* at Doc. 8 & 9. A trial was held May 6, 2003 and the matter was taken under advisement. *See id.* at 13.

### JURISDICTION

This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and this Court has post-confirmation jurisdiction under 28 U.S.C. § 1334 and Middle District of Pennsylvania Standing Order Misc. 84–0203 to render this decision.

### FINDING OF FACTS[2]

Prior to his bankruptcy filing, Louis operated Beltrami Enterprises Incorporated ("BEI") and a number of ancillary businesses, including its subsidiary Lucky

---

1. Drafted with the assistance of Wendy E. Morris, Law Clerk.

2. Upon consideration of the filed pleadings, oral and documentary evidence presented at trial, briefs and applicable law, the Court makes the following findings of facts. In addition, the Court, *sua sponte,* takes judicial notice of all judicial actions previously taken in Louis' bankruptcy proceeding, those associated with *In re Beltrami Enterprises, Inc.* (5–91–bk–00866) and its associated cases, and all

relevant documents filed in district court proceedings. *See* Fed.R.Evid. 201; *Bankr.Evid. Manual,* §§ 201.5, 201.6 (West 2004). The Court's purpose in taking judicial notice of these records is "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (relying on *United States v. Walters,* 510 F.2d 887, 890 n. 4 (3d Cir.1975)).

Strike Coal Corporation ("LSCC"). BEI and LSCC were engaged in the business of surface mining anthracite coal. Louis hired Joseph to work for his companies sometime in 1972. Joseph's duties consisted of providing accounting and financial services for BEI and its subsidiaries. He was also charged with the responsibility of signing and issuing checks to various creditors. His positions over the course of his employment varied and ranged from that of a controller to that of a chief financial officer of BEI. He even held the position of a vice president of one of BEI's subsidiaries. Joseph eventually resigned from his positions with Louis' companies soon after Louis' son, Attorney Michael Beltrami, joined one of BEI's subsidiaries, Booties Corporation, in August 1990.

Joseph also operated a number of personal business ventures in addition to his employment with Louis' companies. One such business, Apollo Trucking, hauled rock coal from Louis' companies in the 1970s for a fee. Apollo Trucking also used Louis' employees to drive and service its trucks without reimbursing Louis for their use. This arrangement continued for a number of years before Louis became apprised of it and put a stop to it.

In March 1982, representatives from BEI and Pagnotti Enterprises, Inc. ("PEI") negotiated PEI's acquisition of BEI and LSCC. A dispute arose years later concerning whether PEI had entered into an agreement to purchase the companies. BEI and PEI attempted to reach a settlement during a meeting in October 1990. Unable to resolve the matter, Louis sought legal representation from the Hourigan, Kluger & Quinn, P.C.[3] ("HKQ") law firm.

On November 6, 1990, a complaint was filed by the trustees of the Anthracite Health and Welfare Fund ("Anthracite litigation") against BEI to recover interim withdrawal liability payments. BEI filed a third-party complaint against PEI on December 14, 1990.

On May 6, 1991, PEI filed a complaint in the Middle District of Pennsylvania against Louis, his wife Elaine, and BEI alleging violations of the Racketeer Influenced and Corrupt Organizations Act.

BEI voluntarily filed a chapter 11 petition on June 3, 1991. Ronald V. Santora of HKQ was listed as the attorney of record. LSCC later filed a petition for chapter 11 bankruptcy protection on October 9, 1991. LSCC was also represented by Attorney Santora and Attorney Arthur Piccone from the HKQ law firm. An Order was entered on December 30, 1991 authorizing substantive consolidation and joint administration of these cases. *See* Docket 5–91–bk–01571 at Doc. 17; Docket 5–91–bk–00866 at Doc. 39.

The attorneys for Louis and BEI concluded that Joseph's participation in resolving the PEI litigation was essential to a favorable outcome. Attorney Santora viewed Joseph—not Louis—as the most logical person to assist him with reviewing documents since he would have had first hand knowledge of BEI's day-to-day operations.

A meeting was held at Colonel Stanley D'Amore's home in June 1992 between Louis, Joseph, and Attorney Beltrami to discuss the terms of Joseph's assistance with the PEI litigation in June 1992. No agreement was reached during this meeting.

---

**3.** At the time of filing, the law firm was known as Hourigan, Kluger, Spohrer & Quinn, P.C. The firms name has since changed to Hourigan, Kluger & Quinn, P.C. and will be referenced as such throughout this opinion.

Louis eventually sought chapter 11 protection on July 2, 1992. Louis' individual bankruptcy case was also handled by the HKQ law firm. Attorney Piccone contacted Joseph a few days later and discussed his possible assistance with the PEI litigation. In exchange for his help, Joseph requested $600,000 cash, 25 acres from real property known as the Brick Plant, one-sixth of any award received from the PEI litigation, and an employment contract. According to Joseph, the $600,000 represented unpaid BEI wages, pension benefits, un-reimbursed travel, and automobile expenses plus compounded interest from 1976 to 1991. Joseph had originally calculated this balance to be far greater than $600,000 but decided to reduce it by an amount Louis felt Joseph still owed the companies or Louis personally. Even though Joseph believed this to be a BEI obligation, he wanted to hold Louis personally liable for payment.

Believing that Louis was agreeable to those terms, Joseph began assisting Attorneys Piccone and Santora with the PEI litigation within a day or two of his conversation with Attorney Piccone. Joseph's tasks consisted of reading documents, compiling documents germane to the PEI litigation into files, making copies, and creating synopses for Attorney Santora's review. He completed these tasks at either BEI or HKQ's offices. Joseph submitted time sheets for the work completed and received $24 an hour and health insurance benefits from Booties Corporation.

Joseph eventually received a written contract from Attorney Piccone that outlined the terms of his service. Unsatisfied with its terms, Joseph tore up the document and stopped working at HKQ.

These cessations became an on-going pattern of behavior between the parties. Whenever an issue arose concerning the terms of Joseph's assistance with the PEI matters, Joseph would stop working at HKQ. Whenever Joseph would stop working, Attorney Santora would contact Attorney Beltrami and indicate that he needed him back. Joseph would eventually return and resume his duties at HKQ sometime thereafter.

In August 1992, Joseph drafted a new agreement between himself and Louis, as both an individual and as the president of BEI, that outlined his requirements for assisting with the PEI litigation. Under his proposal, Joseph agreed to accept $600,000 in lieu of $897,994 in unpaid wages, benefits, perks, and interest from BEI and its subsidiaries. Louis was also required to guarantee payment on any outstanding balance. Joseph's compensation also included an 8% interest in any award arising from a lawsuit Concorde Coal Company, Inc., an entity associated with Louis, had against United States Fidelity and Guarantee Company ("USF & G litigation").

Under the proposed agreement, Joseph was entitled to the following benefits:
- Stock equal to one-sixth the outstanding stock of BEI for the consideration of $1.00.
- A position on BEI's board of directors.
- The right to acquire 25 acres of the Brick Plant property and to have the purchase price deducted from the amounts Louis or his companies already owed him.
- A bonus of $50,000 or 8%, whichever is greater, of any award from the USF & G litigation.
- A five year employment contract with BEI at the rate of $24 per hour.

Louis was also to pay 50% of Joseph's legal fees associated with the agreement or matters involving BEI. That included the fees of an Attorney Merle A. Wolfson, who Joseph later admitted did not represent

him in this matter. These fees were to be deducted from the remaining balance of accrued wages. Louis was also required to satisfy any levies imposed by the Internal Revenue Service against Joseph as a result of his position as an officer of another company associated with Louis, Anthracite Paving & Construction Company, Inc.

Other than the promise that Joseph would forgive $297,494 in unpaid wages, benefits, perks, and interest he thought were due and owing, no mention was made as to an obligation on his part to assist with the PEI litigation.

Joseph eventually resumed his duties in August or September 1992 and continued assisting Attorney Santora with preparations for the PEI litigation. His duties expanded to accumulating exhibits and formulating possible questions for use in upcoming depositions.

Joseph became aware in January 1993 that Louis had refused to sign the August 1992 proposed agreement and once again stopped working. Joseph had a meeting with his nephew, Attorney Beltrami, soon afterwards to discuss having a new agreement drafted. Relying on information obtained from Joseph, Attorney Beltrami drafted the document on January 25, 1993. Attorney Beltrami was included as a contracting party along with his father, BEI, and Joseph. Like his previous requests, Louis was required to personally guarantee the payment of $600,000 to Joseph. In exchange, Louis and Joseph were to waive all claims held against the other for unpaid debts.

However, what was different was how the $600,000 was to be paid. This was to be comprised of: (1) a 15% interest in the attached funds of certain companies when released; (2) a 17% interest in any award arising out of the USF & G litigation; and (3) payments based on the cash availability of Louis or any of his companies.

In comparison to the August 1992 proposal, Joseph's bonus was to equal $200,000 or 8%, whichever was lesser, of the net judgment arising out of the USF & G litigation instead of the previous request of the greater of $50,000 or 8%. Joseph also included a clause that would have obligated Attorney Beltrami to use his best efforts and due diligence to ensure that Louis complied with the contract's provisions.

Joseph resumed his work at HKQ while Michael discussed the proposed January 1993 agreement with his father. As with Joseph's previous offers, Louis refused to sign the agreement due to the inclusion of the provision that sought to hold him personally liable for a BEI debt. However, Joseph did not discover until January 1994 that Louis had refused to sign the January 1993 proposal. Once again, he stopped assisting with the PEI litigation matters.

Joseph contacted Attorney James Senape and had a new agreement drafted in or around February 1994. Unlike the previous proposals, Joseph now included Elaine and several of Louis' businesses as contracting parties in addition to himself and Louis. As with his previous offers, Joseph still demanded $600,000. However, this amount was to be reduced by the $28,500 that had been received during 1993. New to the agreement was the mode of paying the $600,000. This included the option of granting Joseph a 15% interest in the net proceeds of a certain United Kingdom lawsuit related to Louis. A provision was added giving Joseph an interest in a shale removal operation on property owned by Louis. It also included a clause requiring Joseph to participate and cooperate with any litigation, arbitration, or mediation involving Louis, Elaine, or their companies. The agreement spe-

cifically stated that bankruptcy court approval would be sought.

A meeting was later held at Colonel D'Amore's home on February 8, 1994 to discuss the February 1994 offer. Accompanied by Attorney Senape, Joseph presented the agreement to Louis. Once again, Louis refused to accept the offer because it sought to hold him personally liable for a BEI obligation. Joseph left the Colonel's home in an agitated state and Louis did not see his brother again for almost a year.

Joseph filed an unsecured priority proof of claim against Louis' estate on April 18, 1994 for "1,033,207 + int from 4-1-94." According to the document, the claim's basis is unpaid compensation for services from "1976 to the Present Date," plus "25 Acres of real estate, Route 309 South, Hazle Twp, Luzerne County 1/6 interest in real est, Schuylkill County; 1/6 int in any award re: Beltrami Ent/Lucky St." Attached was Joseph's handwritten calculations of his unpaid accrued wages from 1976 to March 31, 1994. His calculations show a final balance of $1,033,207.

Sometime during the second half of 1994, Joseph was deposed in the Anthracite litigation with respect to PEI's liability. Attorney Santora represented him in this matter. After his deposition, Joseph met with Attorney Beltrami and discussed the impasse he was having with Louis concerning the agreement.

After his meeting with Attorney Beltrami, Joseph drafted a new proposal and circulated it to Attorneys Senape and Beltrami. Noticeably absent from this proposal was any reference to a "$600,000" payment. Instead, Joseph included a clause that granted him the right to receive a one-sixth share of any award arising from the sale of BEI, LSCC and the Oneida property to PEI. This new proposal granted Joseph a 40% interest in a sand, stone, and quarry enterprise operated by Louis, Beltrami Brothers Real Estate, or their assigns. Joseph also wanted a one-sixth interest in any award arising from the sale of the Honey Brook Water Company. In addition to the 25 acres of land from the Brick Plant property, Joseph also demanded an additional 37½ acres at a value of $10,000 per acre. This extra acreage was to be considered as a payment toward the unpaid balance of accrued wages. This was to be in addition to the $195,000 payment Louis was to make toward the unpaid balance of BEI accrued wages. There is no mention of what Joseph's obligations would be under the proposed agreement.

Joseph met with Attorney Beltrami again and discussed the proposed agreement.

Joseph eventually resumed his work several weeks later. Joseph was deposed a number of times between the fall of 1994 and the spring of 1995 in relation to the PEI litigation. While being deposed in the PEI litigation on November 22, 1994, Joseph was specifically questioned whether there was any agreement between himself and Louis concerning compensation from the results of any litigation. In response, Joseph testified that there was only a verbal agreement between him and Louis that was entered into between March 1972 and March 1982. According to this agreement, Joseph was to receive one-sixth of the value of any award received in the event the company was either sold or liquidated.

Sometime in early 1996, Joseph prepared a position paper on behalf of BEI with respect to the PEI litigation. In anticipation of an upcoming settlement conference with PEI, Joseph presented his paper to Attorney Beltrami for review. Attorney Beltrami, Louis, and Joseph then

met in Attorney Beltrami's office and discussed the upcoming conference.

On March 13, 1997, this Court executed an Order approving BEI and LSCC's plan of reorganization.

On April 16, 1998, the law firm of Weir & Partners took over Louis' representation in his bankruptcy case. Within the firm, Attorney Bonnie Golub was primarily responsible for Louis' case. Attorney Santora withdrew from Louis' case on April 17, 1998.

Louis' objection to Joseph's proof of claim was filed on December 7, 1998. In response, Joseph discussed the matter with his divorce attorney, Theodore Laputka, Jr. Attorney Laputka then began assisting Joseph with drafting a new agreement. Attorney Laputka's assistance consisted of redrafting a document he had originally received from Joseph. In addition to listing Joseph and Louis as the contracting parties, it also included Attorney Beltrami. Absent from the new agreement was Joseph's prior demand that Louis pay $600,000 on account of a BEI obligation. Instead, Joseph sought a one-sixth interest in all business ventures, sales, awards, or leases dealing with BEI, LSCC, and the Oneida property. He also requested 82½ acres from the Brick Plant property after Louis' bankruptcy was complete. Joseph was also to receive the right to acquire a permit to remove shale, for his own benefit, from the remaining acreage of the Brick Plant held by Louis. This is all in consideration of Louis and Joseph waiving certain claims they, or their companies, may have held against the other. While the agreement acknowledges Louis' bankruptcy proceeding, it specifically states that it "shall not be recorded, published or disclosed to any non-parties to the Agreement, other than the immediate family of the parties, attorneys representing any of the parties hereto, or the Arbitrator selected to resolve such a dispute." For his part, Joseph agreed to participate and cooperate with any litigation, arbitration, or mediation involving Louis, his wife Elaine, or any of their companies by sharing any relevant files, documents, correspondence, books, records, data, or information he had personally compiled. This agreement was sent to Attorney Beltrami, who then forwarded it to Attorney Golub.

Attorneys Laputka and Golub had a telephone conversation in December 1998 and discussed the new offer. A meeting was later held on February 3, 1999 in Attorney Beltrami's office between himself and Attorneys Laputka and Golub to discuss the proposed agreement. Unable to reach a resolution, Attorney Laputka left the meeting.

Louis filed his *Second Amended Plan of Reorganization* on March 3, 1999, which was also served upon Joseph. This plan was later modified on February 5, 2001 and served upon Joseph.

A motion was filed on February 5, 2001 seeking approval of a global settlement of various adversary proceedings between Louis, BEI, LSCC, and PEI. An Order was executed on March 5, 2001 approving the settlement.

### DISCUSSION

The cast of characters and sequence of events involved in this proceeding loosely mirrors that of a modern day Greek tragedy or a poorly crafted made-for-television movie: two malcontent brothers and more attorneys than one may deem necessary to negotiate the terms of a contract.

Joseph's complaint seeks allowance of a post-petition, pre-confirmation claim that was originally filed on a Proof of Claim form (Official Form 10), as a Class 6 claim under the terms of Louis' confirmed plan. This claim is based on an alleged contrac-

tual obligation Joseph had with Louis. Joseph relies on three legal theories for recovery: (1) Breach of Contract; (2) Restitution; and (3) Misrepresentation.

Although Joseph's claim is post-petition in nature, he has elected not to formally pursue it as an "administrative expense" of his brother's bankruptcy estate. Nonetheless, this Court's decision is guided by § 503(b) of the Bankruptcy Code ("Code"). Joseph is therefore saddled with the burden of proving entitlement to payment from Louis' estate.

Closer examination of Joseph's complaint causes this Court to note that he is essentially seeking the allowance of a post-petition, but pre-confirmation, claim for services that were allegedly rendered to Louis' estate while he was acting in the role of a professional. In his complaint, Joseph alleges that "[i]n justifiable reliance on the Debtor's promises and agreements, [he] provided continuing support and assistance to [Louis], as requested, including professional forensic accounting and litigation support services, from which [Louis] has greatly benefitted." *See* Docket 5–01–0227, Doc. 1 at ¶ 7. Aside from his reliance on contract and tort law principles, Joseph's allegations have, whether intentional or not, drawn this Court's attention to § 327 of the Code. Section 327(a) provides that:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a)

Although the foundation of Joseph's complaint is based on theories of contract law, he is, in essence, requesting court approval for compensation from Louis' bankruptcy estate for professional services rendered on its behalf. As such, this Court has a duty to review his request under the statutory standards articulated in § 327. *See In re Busy Beaver Bldg. Centers, Inc.,* 19 F.3d 833, 841 (3d Cir. 1994). It is this duty that causes the Court to now reflect on the impact § 327 may have on Joseph's complaint.

In addition to Joseph's allegation that he provided services to Louis in a professional capacity, there are a number of references in the record that he has, at some point in time in his career, performed the duties of an accountant. However, the record lacks sufficient evidence that would lead this Court to a conclusion under § 327(a) that Joseph was, in fact, operating as a professional or that his post-petition services were—in total or in part—of a professional nature. *See generally United States Trustee v. McQuaide (In re CNH, Inc.),* 304 B.R. 177, 179–81 (Bankr.M.D.Pa.2004). This Court inquiry under § 327(a) must therefore end and shift to the claim's merits under the relevant portions of Pennsylvania contract law.

### I. BREACH OF CONTRACT

In breach of contract actions, the plaintiff bears the burden of proving a breach by a preponderance of the evidence. *See Viso v. Werner,* 471 Pa. 42, 369 A.2d 1185, 1187 (1977); *Allegheny Ctr. Assoc. v. Appliance Store, Inc. (In re Appliance Store, Inc.),* 148 B.R. 226, 230 (Bankr. W.D.Pa.1992). The principles of contract law are quite elementary and, simply stated, consist of an offer, acceptance, and consideration. *See generally Maintenance Specialties, Inc. v. Gottus,* 455 Pa. 327, 314 A.2d 279, 285 (1974); *Martin v. Pennsylvania Turnpike Comm'n,* 381 Pa. 67, 112 A.2d 167, 169 (1955). In addition, "[t]here must be a meeting of minds in order to

constitute a contract." *Martin*, 112 A.2d at 169. "[T]he very essence of an agreement is that the parties mutually assent to the same thing,.... Without such assent there can be no enforceable agreement...." *Accu–Weather, Inc. v. Thomas Broadcasting Co.*, 425 Pa.Super. 335, 625 A.2d 75, 78 (1993) (citation omitted). "It is axiomatic that before a contract may be found, *all* of the essential elements of a contract must exist...." *Schreiber v. Olan Mills*, 426 Pa.Super. 537, 627 A.2d 806, 808 (1993)(emphasis in original).

The offeror must convey a promise "that is sufficiently definite on essential elements, when read in light of circumstances, to enable a determination of whether the contract has been performed." *Columbian Rope Co. v. Rinek Cordage Co.*, 314 Pa.Super. 585, 461 A.2d 312, 316 (1983) (citations omitted). An offer only becomes a binding promise and results in a contract when there is an unconditional acceptance of its terms. "It is a basic principle of the law of contracts that an acceptance must be unconditional and absolute." *O'Brien v. Nationwide Mut. Ins. Co.*, 455 Pa.Super. 568, 689 A.2d 254, 258 (1997) (citation omitted). "So long as any condition is not acceded to by both parties to the contract, [their] dealings are mere negotiations and may be terminated at any time by either party while they are pending." *Martin*, 112 A.2d at 169. However, "a reply to an offer which changes the conditions of the offer is not an acceptance, but a counteroffer." *Accu–Weather, Inc.*, 625 A.2d at 77 (relying on *Hedden v. Lupinsky*, 405 Pa. 609, 176 A.2d 406, 408 (1962)).

"[I]t is equally well-established that 'an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer is germane to show whether the offer' is accepted." *Accu–Weather, Inc.*, 625 A.2d at 78 (citing *Gum, Inc. v. Felton*, 341 Pa. 96, 17 A.2d 386, 389 (1941)). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." *Temple Univ. Hosp., Inc. v. Healthcare Management Alternatives, Inc.*, 764 A.2d 587, 593 (Pa.Super.Ct.2000)(citing John Edward Murray, Jr., *Murray on Contracts* § 37, at 82 (3d ed.1990)).

Pennsylvania's Supreme Court defines the last element, consideration, "as a benefit to the party promising or a loss or detriment to the party to whom the promise is made." *See Hillcrest Found. v. McFeaters*, 332 Pa. 497, 2 A.2d 775, 778 (1938). The Court further noted in *Stelmack v. Glen Alden Coal Co.* that "it is not enough, however, that the promisee has suffered a legal detriment at the request of the promisor. The detriment incurred must be quid pro quo or the price of the promise, and the inducement for which it was made. Consideration must actually be bargained for as the exchange for the promise." *See* 339 Pa. 410, 14 A.2d 127, 128 (1940)(internal quotations omitted).

Turning to the case at hand, Joseph has presented this Court with seven instances where offers were present and either rejected or accepted: June 1992, July 1992, August 1992, January 1993, February 1994, Fall 1994, and December 1998. Of these instances, there is uncontradicted evidence in the record that the June 1992 and February 1994 offers never lead to a finalized contract. This Court is therefore left to determine if any of the remaining offers had ever developed into an enforceable contract. The Court was presented with the following testimonies with respect to each offer:

*July 1992*

Joseph testified that Attorney Piccone told him during their 45 minute telephone conversation that he had authority from Louis to commit to Joseph's offer and that a commitment was in fact made, thus inducing him to start working on the PEI litigation matters. This is coupled with Louis' presence at a meeting that allegedly took place in Attorney Piccone's office one week to ten days later among Joseph, Louis, and Attorney Piccone during which Louis commented that Joseph's terms "will be a drop in the bucket, we're going to win so big at-from Pagnottis, I won't mind paying you this." *See* Transcript of 6/26/01 at 63, lines 10–12. It was not until Joseph received a written contract one to two weeks later, that he ripped it up and stopped working because it did not conform to his requested terms.

However, Louis does not remember any meeting held in Attorney Piccone's office with Joseph. Nor did he ever give Attorney Piccone authority to accept this agreement on his behalf. There is also testimony on the record from Attorney Piccone's associate, Attorney Santora, that Attorney Piccone had no recollection of participating in this alleged meeting or of there ever being a final agreement.[4]

*August 1992*

Joseph also argues that the August 1992 offer was accepted by Louis through Attorney Santora. More specifically, Joseph testified that Attorney Santora telephoned him in August or September 1992 and asked him to return to work. At which point, Joseph indicated that he would only return if Louis honored his requested terms. Joseph later received a telephone call from Attorney Santora in which he said, "Come on back to work, Lou agrees to the commitment, we need you." *See*

Transcript of 6/26/01 at 71, lines 18–19. It supposedly was not until a January 1993 meeting in Attorney Santora's office, which included Attorney Beltrami, that he learned from Attorney Santora that Louis had refused to sign the contract.

Attorney Santora testified that although he was aware that there were on-going negotiations between Joseph and Louis concerning how Joseph wanted to be compensated for his assistance and had even been shown various drafts, he purposely refrained from involving himself. Neither was he privy to their negotiations. He also was not aware of any agreement the parties may have reached. Nor had he received any communication from a lawyer representing Joseph that the parties had, in fact, reached an accord. If he had, he would have presented it to this Court for approval. He instead informed the parties, at various times, to notify him once they had reached an agreement so that it could be presented to the bankruptcy court for approval.

Aside from conversations he had with Attorney Beltrami when Joseph would stop working, he never personally asked Joseph to return to work. He also never knew why Joseph would eventually return to work each time and he never asked. Attorney Santora also noticed that Joseph would stop working whenever he would have a disagreement with Louis. It appeared to him that Joseph would stop working on the eve of a major or critical event in the various litigations. According to Attorney Santora, Joseph's proximity to the individuals involved with the various litigation proceedings gave him intimate knowledge of when various events were on the horizon.

---

**4.** There was no objection to this hearsay comment. Transcript of 6/27/01 at 95, lines 1–5.

### January 1993

Like the August 1992 offer, Joseph alleges that an agreement also rose out of his January 1993 offer. Joseph claims that it was not until after Attorney Beltrami made assurances in Attorney Santora's presence, that he had authority to act on Louis' behalf and that Louis had reviewed the agreement with him and was in complete accord with its terms that he returned to work in January 1993. Further discussions during this meeting led to Joseph's understanding that court approval of the contract would not be sought because "Louis positively will live up to this" and that there was a "concern that the Pagnotti Group might see this as a rift or differences between Louis and [Joseph]." *See* Transcript of 6/26/01 at 80, lines 16–19.

In addition, Joseph contends that Louis informed him at a meeting held sometime later in Attorney Santora's office that he had reviewed the agreement with Attorney Beltrami and that he was going to sign it shortly and have Attorney Beltrami return it to him. Joseph alleges that he followed up with Attorney Beltrami seven to eight times over the course of a year with regard to the agreement's whereabout. According to Joseph, Attorney Beltrami repeatedly declared that "the agreement was signed, it's at my dad's house. All I've got to do is stop by and pick it up and I'll have it for you." *See* Transcript of 6/26/01 at 82, lines 13–15. It was not until the early part of 1994 that Joseph allegedly told Attorney Beltrami:

> I want the agreement ... I'll go down for it at the house myself. You know, I've asked you all year long. We've gone through all of these depositions. I did all of this hard work in 1993 which was preparing for the depositions, the questions, the exhibits, being at the depositions, assisting attorney Santora ... All of this time in 1993 you've told me

repeatedly that it's signed, you've got to pick it up. I relied on your word. I asked you a number of times during the year if you wanted me to pick it up. You said no, you'll take care of it.

*See* Transcript of 6/26/01 at 82–83, lines 21–25, 1–6.

Allegedly, Attorney Beltrami woefully replied: "I'm sorry, Uncle Joe, my dad refused-my dad did not sign it.... He refuses to sign it. He's not going to sign it." *See id.* at 83, lines 6–7, 10–11. It was at this point that Joseph stopped working and contacted Attorney Senape.

Both Attorneys Santora and Beltrami find fault with Joseph's rendition of the events. First, Attorney Santora testified that although he may have been present one or two times when Michael asked Joseph to continue working and that they would keep talking, he neither heard nor saw an actual agreement between the parties. He also never voiced any comment to either Joseph or any of his attorneys that would give rise to an inference that any resulting agreement would not be brought before the bankruptcy court for approval. In fact, he specifically remembers instructing the parties to inform him when an agreement had been reached because it had to be court approved before it was carried out. He made a point of informing the Beltramis that any agreement reached would not be enforceable absent bankruptcy court approval.

In addition, Attorney Beltrami denies telling Joseph that the January 1993 proposal had been signed or that he had authority from his father to bind him to such an agreement. Nor does he recall a meeting held at the HKQ law firm in order to discuss this offer. When questioned by Joseph's counsel if he recalled Joseph's suggestion that he, himself, would go to pick up the agreement at Louis' house, Attorney Beltrami responded: "If he

wanted to go to the house and pick it up, why didn't he do it, if there was a signed agreement?" *See* Transcript of 6/26/01 at 119, lines 23–24. Furthermore, Attorney Beltrami has never represented his father in his bankruptcy case. This statement was in tune with Louis' testimony that he never sent his son to mediate the dispute he was having with this brother. It is Attorney Beltrami's contention that is was always Joseph who would approach him and have him act as the middleman with his father.

*Fall 1994*

With regards to his Fall 1994 offer, Joseph claims that he had the following conversation with Attorney Beltrami in an attorney conference room before his deposition in the Anthracite litigation:

> I asked Michael, "Do you have anything to say to me?" He said he was sorry for leading me on and lying to me all those times in 1993, but they needed me to do the work and to assist in the depositions and were the most fruitful. And, he assured me that he would like to get together with me after this deposition and see if we could put things back on track.

Transcript of 6/26/01 at 89, lines 4–10.

Joseph testified to the following. He and Attorney Beltrami began negotiating terms that Louis would find acceptable. Attorney Beltrami even memorialized these negotiations in a one page document. At the conclusion of their negotiations, Attorney Beltrami assured Joseph that he had authority to commit Louis to this agreement and that he was going to prepare a written agreement. Attorney Beltrami was also going to prepare a mortgage on the Brick Plant property in Joseph's favor but that neither the signed agreement nor the mortgage could be recorded. He asked Joseph to trust that both he and his father would follow

through and give him what he had coming. Several weeks later, Attorney Beltrami assured Joseph that the mortgage had been prepared and signed but that he had to keep it in his possession until the bankruptcy was over. To this, Joseph replied, "I trust you and your dad this time, one more time" and returned to his duties at HKQ. *See id.* at 97, line 8. This exchange was followed by a telephone call to Joseph to prepare a position paper for an upcoming PEI settlement conference. During this conversation, Louis told Joseph that "You have my word that I'll never let you down. I'll always live up to this agreement. Michael discussed it with me. You've got the mortgage prepared, and Michael will be getting the agreement. I guarantee you, Joe, I'll never let you down for all you've done for me." *See* Transcript of 6/26/01 at 97–98, lines 25, 1–5. Joseph argues that Louis made a similar statement when they met with Attorney Beltrami to discuss the position paper, which elicited the response, "Okay, I'm going to trust you to please take care of me in this matter." *See id.* at 99, lines 6–7.

With respect to the issue in general, Louis testified that he never accepted any of the draft agreements presented by Joseph or signed any contract. Attorney Beltrami supplements this declaration with his own insistence that he never tried to mislead his uncle into thinking that there was an agreement and was completely candid with him. He insists that the only representations he ever made to Joseph that led to him returning to work were "we'll try to make a deal, we'll try to come up with some type of deal, we'll do something at some point. I'm sure we'll get a deal" or "we're going to try to get a signed agreement." *See* Transcript of 6/26/01 at 133–34, lines 25, 1–2; Transcript of 5/6/03 at 24, lines 14–15. He absolutely denies

telling Joseph that a mortgage on the Brick Plant property had been prepared for him.

### December 1998

Lastly, Joseph argues that an enforceable contract between him and Louis arose out of an offer in December 1998. According to Joseph, he contacted his divorce attorney, Attorney Laputka, for help on December 21, 1998, the Monday before Christmas. Joseph insists that during a telephone call with Louis, his brother apologized that an objection had been filed to his proof of claim and that neither he nor his son knew anything about it. Louis uttered, "Joe, I'll never let you down. I made these promises to you. Everything's going to be fine, and I have no idea what happened here. I'll take care of it. We'll straighten it out. But I do want to see you because I don't want you feeling that I'm going to try—that I'm going to swindle you or let you down." *See* Transcript of 6/26/01 at 104, lines 1–6. The two later met at a restaurant on December 28, 1998 where Joseph maintains Louis apologized again and reiterated the terms of their agreement. Joseph further testified that this conversation was followed by a telephone call from Attorney Beltrami on December 30, 1998 that consisted of assurances that "we're never going to let you down," "we're going to do something about this objection," and "we're going to straighten this out." *See* Transcript of 6/26/01 at 106, lines 6–7, 8, 18. Joseph's part of the conversation included the reply:

If we—if we would have to go forward with the Objection, Pagnotti's going to think it's a crack in our armor, and then they're going to feel that, well, wait a minute, why should we settle. Maybe Joe and Lou are fighting.... Besides, everything here you agreed to, you [*sic*]

father agrees to. I don't understand what the problem is.

*Id.* at 106, lines 11–16.

According to Joseph, this conversation was followed by a telephone call between Attorneys Golub and Laputka conducted by speaker phone on Thursday, December 31, 1998. Joseph claims that he was in Attorney Laputka's office during the conversation and Attorney Golub indicated that there was no problem with the agreement but that she did not want Louis or Attorney Beltrami to sign it because she wanted "to clean up the legalese." *See id.* at 108, line 17. Joseph later attended a meeting at Louis' house in June 2000 where they discussed the terms of the PEI litigation settlement and what Joseph was going to receive. Unable to reach a resolution on what Joseph would receive, the meeting ended.

Relying on his records and memories, Attorney Laputka testified to having a conversation with Attorney Beltrami concerning the drafted agreement. It was at that point, Attorney Beltrami suggested he speak with Attorney Golub. Attorney Laputka then had a conversation with Attorney Golub via speaker phone on December 18, 1998. Joseph was also present for this conversation. Attorney Laputka claims that Attorney Golub indicated during the conversation that the proposed agreement was fine but that she wanted to "tweak the language." He then testified that it was not until after he had this conversation that Joseph received the objection to his claim. He later had a discussion with Attorney Beltrami and Louis in a restaurant on December 22, 1998 where they expressed surprise that the objection had been filed since they believed that they had an agreement with Joseph. Attorney Laputka specifically recalls Louis stating that they had an agreement with Joseph.

A couple of months later, Attorney Laputka took part in a meeting with Attorneys Beltrami and Golub for the purpose of having the proposed agreement signed. Upon learning that Louis was not going to attend, Attorney Laputka refused to stay and left.

Not surprisingly, the memories of Louis and Attorneys Beltrami and Golub are drastically different. Louis has no recollection of expressing surprise to either Joseph or Attorney Laputka that an objection had been filed since he had never agreed to enter into an agreement with Joseph. Neither does he recall meeting Joseph in a restaurant to discuss matters surrounding the alleged agreement. Moreover, he definitely does not recall ever speaking to Attorney Laputka since he has not spoken to him for a period of ten years. And, even if Attorney Laputka had been present in the restaurant when he was there with his son, Louis claims that he never would have noticed his presence. Louis harbors a strong dislike for Attorney Laputka and blames him for the litigation with Pagnottis and the bankruptcy.

Attorney Beltrami also has no memory of Attorney Laputka approaching him in a restaurant and discussing the filed objection. However, what he may recall is a telephone conversation with Attorney Laputka in which they discussed the objection and Attorney Beltrami expressed surprise that it had been filed since they had been trying to negotiate a deal with his uncle.

With regard to her interactions with Joseph and Attorney Laputka, Attorney Golub indicated that she had initially sent a letter to Joseph requesting documentation that would substantiate his proof of claim. Upon hearing no response and consulting with her client, she filed an objection to Joseph's proof of claim. Although she does remember receiving a telephone call from Attorney Laputka in December of that year, she emphatically denies accepting the proposed agreement on Louis' behalf because she lacked the necessary authority from Louis. Neither did she ever indicate that she had to "tweak" the proposal.

In addition, she strongly disagreed with Attorney Laputka's rendition of the meeting held in Attorney Beltrami's office. Contrary to Attorney Laputka's testimony, she indicated that the meeting's purpose was not to sign the proposed agreement but instead to discuss its terms. Furthermore, the meeting did not end because of Louis' absence. According to Attorney Golub, the meeting ended because they would not agree to Attorney Laputka's request to have his legal fees paid under the agreement. Until that point, neither side had reached an agreement on any of the proposed terms.

Whether Joseph has met his burden of proving the existence of an enforceable contract binding Louis is dependant upon the record placed before me, as the fact finder. The record of the proceeding is littered with a myriad of conversations of a "he said/she said," or more appropriately stated "he said/he said," nature. As the fact finder, I do not acquire unassailable, accurate knowledge of what in fact occurred. *See In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)(J. Harlan concurring). As Justice Harlan aptly noted in his concurring opinion in *Winship*:

> Instead, all the fact finder can acquire is a belief of what probably happened. The intensity of this belief—the degree to which a fact finder is convinced that a given act actually occurred—can, of course, vary. In this regard, the standard of proof represents an attempt to instruct the fact finder concerning the

degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.

*Id.*

 In my quest to discover what actually occurred, I have had many opportunities throughout this proceeding to judge the various witnesses' demeanor and credibility. "A witness's demeanor is often a critical factor in determining his veracity." *Dia v. Ashcroft*, 353 F.3d 228, 252 n. 23 (3d Cir.2003)(citing *Aguilar–Solis v. INS*, 168 F.3d 565, 570–74 (1st Cir.1999)). A witness' "demeanor is often used as part of the evidence probative of [his] credibility" and generally includes his "dress, attitude, behavior, manner, tone of voice, grimaces, gestures and appearance." *See* Hon. James P. Timothy, *Deamor Credibility*, 49 Cath. U.L.Rev. 903, 907 (Summer 2000). However, "[c]redibility involve[s] more than demeanor. It apprehends the over-all evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." *Government of Virgin Islands v. Gereau*, 523 F.2d 140, 146 n. 12 (3d Cir.1975)(citing *Carbo v. United States*, 314 F.2d 718, 749 (9th Cir.1963); *Indiana Metal Products v. NLRB*, 442 F.2d 46, 52 (7th Cir.1971)).

In light of my observations, I find the evidence advanced in support of Joseph's claim that the contract was created between himself and Louis to be far less credible than the evidence presented to the contrary. In particular, the Court finds the testimonies of Joseph and Attorney Laputka to be far from credible.

With regard to Joseph's testimonies, the Court notes that his testimony appeared—more often than not—to be scripted and rehearsed. It seemed as though he was reading passages from a tome in a very calm and monotonic fashion. His testimony was extremely stilted. These recitations were peppered with a number of pauses that could reasonably lead to the conclusion that Joseph was trying to remember his next line. While the Court recognizes that these factors may reflect an individual's personality traits and not level of credibility, they become more indicative of Joseph's lack of credibility when his recitation of certain events was often in response to leading questions from his attorney.

This Court also finds it difficult to believe that Attorneys Piccone, Santora, Beltrami, or Louis did voice the various comments Joseph alleges were made. Compared with the demeanor each exhibited while testifying, the Court does not find that either Louis or his son formulated these statements in the alleged manner to which Joseph testified. After having the opportunity to observe Louis and Attorney Beltrami's attitude, behavior, grammar, and tone of speaking, this Court cannot find that either Louis or his son made these commitments. Moreover, the Court finds it unfathomable to believe that a person, who had supposedly been deceived a number of times by both his brother and nephew concerning whether a contract had been signed, would continue working for an extended period of time, over a number of years, based on repeated assurances that a contract had been signed, without proof of an executed contract.

Joseph's credibility concerning the existence of a contractual relationship with his

brother is further deteriorated by the testimony Joseph gave under oath in November 22, 1994 during a deposition in the PEI litigation. The following was read into the record:

[Attorney Metz:] Recall being asked the question—

Q "Can you tell me, do you have any agreement with your brother Louis which would in any way compensate you for the results of any litigation." Now, that's the same litigation that's involved in these various draft agreements, is it not—the litigation against Pagnotti?

[Joseph:] Yes.

[Attorney Metz continuing:]

A "Not specifically for the litigation. We have an agreement among ourselves for a portion of any award that's received as a result of a sale to Beltrami Enterprises [*sic*], not necessarily linked to this litigation.

Q As best as you can, could you tell me the outline and terms of that agreement?

A It would be basically for one-sixth of the value of any award received. And you are aware that there are substantial amounts of money owed to me personally by Beltrami Enterprises for accrued wages and benefits.

Q When was that agreement entered into?

A It's a verbal agreement we have. We've had it for many years.

Q Can you give me any greater specificity as to the date the agreement was entered into?

A A very long time ago. I can't recall the exact time.

Q Well, let's use a date that everybody seemed to like in this case. Let's use March 17th of 1982. Can you

tell me, was the verbal agreement you've discussed entered into with your brother before March 17 of 1982?

A Yes, yes.

. . .

Q Have you ever engaged in any effort to reduce the agreement to writing?

A We talked about it a few times. He—we had some notes, and a long, long time ago—nothing was finalized. I trust him.

Q Could you explain what you mean when you say finalized?

A We would talk about different things, and just as we're taking notes today, we would take notice—notes about who's promising that—what—who's promising what, and that's the extent of it. I trust him, and he trusts me. And—

Q Do you have those notes?

A No.

Q When was the last time you saw those notes?

A Years. Now these were not formal notes. They were just something we would write down as we were speaking today . . . ."

*See* Transcript of 6/27/01 at 50–52, lines 11–25, 1–13, 3–18.

Despite agreeing that the above dialogue was his testimony, Joseph maintained that he thought the deposing attorney was referring to a written agreement, and the portion read into the record referred mostly to accrued wages. After eventually agreeing with Louis' counsel that he never mentioned the existence of any of the presently alleged agreements he has with his brother, he hypothesized that maybe he had misunderstood the question during the deposition.

The lack of veracity that Joseph has exhibited toward this matter causes this Court to consider the following: When was Joseph being untruthful? During his deposition while under oath or while he testified under oath in this proceeding? It is difficult for this Court to identify any modicum of credibility Joseph may possess concerning this issue when he shows a complete disregard for the truth. Joseph's predilection toward prevarication discounts his arguments that the various offers tendered had resulted in the formation of an enforceable contract.

Joseph's credibility issues also taint Attorney Laputka's testimony on a supposedly accepted December 1998 offer. Both Joseph and Attorney Laputka testified to the series of events that surrounded the January 1998 offer. However, their memory of when the objection was received and when subsequent actions were taken differs.

Joseph testified that it was not until he had received the objection in the mail that he contacted Attorney Laputka on December 21, 1998, the Monday before Christmas. This then led to the drafting of the December 1998 offer and the telephone conference between Attorneys Laputka, Golub, and himself on Thursday, December 31, 1998. Yet, relying on his records and memory, Attorney Laputka testified that the telephone conference between Attorney Golub, Joseph, and himself occurred on December 18, 1998. It was not until a few days *later* that Joseph had received the objection.

While the Court can easily dismiss a witness' inability to recall the exact date when something occurred, it cannot ignore the significance associated with a witness' certainty of when particular events alleged occurred. This is especially true when their order conflicts with other evidence presented in support. Both witnesses invoked a certain level of certainty in their recollection of when particular events—which they were both a party to—transpired. Joseph appeared to be very definite on the date when things occurred; there was no wavering or need to pause and reflect on when something happened. He knew dates, the corresponding weekday, and their relationship to the Christmas holiday. Whereas, Attorney Laputka's certainty was derived from his memory and records. The Court concludes that these testimonies have done nothing more than further deteriorate Joseph and Attorney Laputka's credibility.

The Court also finds fault with both witnesses' testimonies on the telephone conference with Attorney Golub. It is particularly interesting how two individuals who were allegedly present for a telephone conference that was conducted via speaker phone have different recollections of the language used by the speaker, especially when the alleged language was of such a unique nature that their memories should not have greatly differed.

Additionally, it appears that this same speaker phone conversation between Attorneys Golub and Laputka, on which both Joseph and Attorney Laputka testified, occurred on two different dates——one before the objection was filed on December 18, 1998 and one after the objection was filed, more specifically on December 31, 1998. No mention or indication was made by either witness that more than one telephone conference was held between themselves and Attorney Golub. Perhaps this information wasn't clarified for the Court's benefit but, relying on the present record, the Court can only logically assume that only one telephone conversation between Joseph and Attorneys Golub and Laputka occurred with respect to the December 1998 offer.

Although Louis agrees that he had previously offered Joseph the right to purchase 25 acres of Brick Plant property, one-sixth of whatever was recovered from PEI, and 65 acres of the Oneida property if the PEI litigation was won, he steadfastly maintains that he had never accepted the terms of any of Joseph's offers. Specifically, because Joseph was attempting to hold him liable for a financial obligation of BEI. Joseph even acknowledges that Louis never signed a written contract. Based on the lack of credibility of Joseph's testimony and that of Attorney Laputka, this Court cannot conclude that Louis accepted any of the offers advanced by Joseph or that Joseph had ever accepted Louis' counter-offer. Moreover, no offer was accepted on Louis' behalf through his son or various attorneys.

## II. RESTITUTION

 In the event this Court denied Joseph relief under the theory that a contract had been breached, he requests relief based on the doctrine of restitution. Pennsylvania law recognizes the doctrine as "a principle of quasi-contract designed to effect fairness and equity where a benefit has been unjustly conferred." *Sevast v. Kakouras*, 841 A.2d 1062, 1067 (Pa.Super.Ct.2003). "When there is no express contract between the parties, a plaintiff may still recover under a quasi-contract theory." *Temple Univ. Hosp., Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501, 507 (Pa.Super.Ct.2003). A quasi contract, or a contract implied in law, is "not based on the apparent intention of the parties to undertake the performances in question, nor are they promises" unlike an express or contract implied in fact. *See Martin v. Little, Brown and Co.*, 304 Pa.Super. 424, 450 A.2d 984, 988 (1981); *see also Schott v. Westinghouse Elec. Corp.*, 436 Pa. 279, 259 A.2d 443, 449 (1969). "Quasi-contracts may be found in the absence of any expression of assent by

the party to be charged and may indeed be found in spite of the party's contrary intention." *Martin v. Little, Brown and Co.*, 304 Pa.Super. 424, 450 A.2d 984, 988 (1981). "To sustain a claim of unjust enrichment, it must be shown by the facts pleaded that a person wrongly secured or passively received a benefit that it would be unconscionable to retain." *Id.*

 "The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited [*sic*] as a result of the actions of the plaintiff." *Temple Univ. Hosp., Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501, 507 (Pa.Super.Ct.2003)(citing *Ameri-Pro Search Inc. v. Fleming Steel Co.*, 787 A.2d 988 (Pa.Super.Ct.2001)). "In other words, the defendant makes restitution to the plaintiff in *quanum meruit.*" *Id.*

 "The purpose of quasi-contacts is to accomplish restitution, i.e., to place the parties in a status quo as if no unjust enrichment had occurred." *Sevast v. Kakouras*, 841 A.2d 1062, 1067 (Pa.Super.Ct.2003)(citing John Edward Murray, Jr., *Murray on Contracts*, § 19 at 35 (3d ed.1990)). The measure of recovery "is limited to the value of the benefit to the other party derived from the performance in advancing the object of the contract, even though the sums expended or the value of the services rendered may be greater than the amount of such benefit conferred." *West v. Peoples First Nat'l Bank & Trust Co.*, 378 Pa. 275, 106 A.2d

427, 433 (1954)(relying on Restatement on Contracts § 468(3); Restatement on Restitution, § 155(1) & comment d.). "As a general rule, volunteers have no right to restitution" *Martin*, 450 A.2d at 988.

Joseph claims that he holds a valid claim for restitution based on the value of the property promised by Louis, the value of his services and the benefits conferred upon Louis, in an amount greater than $1 million. He even advanced the claim that he never submitted all of his time sheets. Despite these allegations, nothing in the record can support these statements.

There is no dispute between the parties that Joseph did provide post-petition services to both Louis' and BEI's estate, for which he received compensation at the rate of $24 per hour plus health insurance from a BEI subsidiary, Booties Corporation. Yet for some reason—which was never adequately explained on the record—Joseph did not submit all of his time sheets. He makes this assertion with no proof to substantiate this claim. The record is devoid of any evidence that would substantiate this allegation.

With regard to the "value" of the benefit Louis' estate derived from Joseph's services, the only evidence of such came from Attorney Santora. He testified that Joseph assembled the bulk of the documents requested by a document production request in the PEI litigation. According to Attorney Santora, a legal assistant would have spent more time compiling the documents since he/she would have been unfamiliar with the documents. At the time, his firm would have charged a client $35–45 an hour depending on the level of the assistant. However, he concluded that $41,000 plus $23,000 in benefits would have been reasonable compensation for a paralegal in 1992 and 1993. Based on Attorney Santora's testimony, his firm would have paid an individual performing similar services a combined total of $30.17[5] an hour in compensation and benefits. To the extent that there is a difference, Joseph is therefore entitled to the difference between the established market rate of $30.17 per hour for pay and benefits and the amount he was paid, $24.00 per hour plus health insurance, for the hours he actually performed services on the estate's behalf. Based on the admitted evidence, Joseph is awarded the sum of $7,075.50.[6]

### III. MISREPRESENTATION

The Court finds it unnecessary to analyze Joseph's claim based on the theory of misrepresentation since it has awarded him restitution based on a quasi-contract theory. *See generally Duquesne Light Co.*

---

5. CALCULATIONS:

Monetary Compensation:

$41,000/year ÷ 52 weeks/year = $788.46/week ÷ 40 hours/week = $19.71/hour

Benefits:

$23,000/year ÷ 52 weeks/year = $442.31/week ÷ 40 hours/week = $11.06/hour

TOTAL = $30.17/hour

6. CALCULATIONS:

Monetary Compensation & Benefits Owed:

2,347.65 total hours × $30.17/hour = $70,828.60

Unpaid Monetary Compensation & Benefits Due:

$70,828.60–$63,753.10 (amount paid) = $7,075.50.

*See* Transcript of 5/6/2003 at 55–57; Plaintiff's Exhibits 9 and 15(Note: Plaintiff's Exhibit 15 incorrectly indicates that Joseph was paid a total of $64,689.10. Based on the Court's calculations, Joseph actually received $63,753.10 for the period of 1992–1998);.

*v. Westinghouse Elec. .Corp.*, 66 F.3d 604 (3d Cir.1995)(Pennsylvania's economic loss doctrine); *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10 (Pa.Super.Ct.2002)("gist of the action" doctrine). Even if this conclusion is incorrect, this Court would still deny Joseph's request for relief based on a claim of misrepresentation.

Joseph alleges that his claim for damages is based on Louis' alleged misrepresentations and tortious misconduct. Although Joseph has not identified the type of misrepresentation upon which his claim is based—intentional, negligent, innocent—the common element of each is that a misrepresentation was communicated to him either personally by Louis or on his behalf. *See Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 560 (1999)(Pennsylvania's courts recognize all three forms of misrepresentation.). Proof of such hinges, in total and/or in part, on this Court issuing a finding that Attorneys Santora, Piccone, Beltrami, or Golub possessed either actual or apparent authority to contractually bind Louis to Joseph and that they did act on his behalf by giving voice to the alleged misrepresentations and/or that Louis, himself, communicated certain misrepresentations. For this Court to make such a finding, it would have to find the evidence offered to support the existence of these statements to be credible. As this Court has previously discussed, it finds these sources to be less than credible.

 In addition, the Court finds that Attorney Beltrami's requests to Joseph to return to work do not rise to the level of misrepresentations. The Court first notes that Attorney Beltrami never represented Louis in his bankruptcy case. In addition, the Court also finds that Louis never asked his son to act as the go between with Joseph. Nonetheless, Pennsylvania courts recognize four ways an individual may be viewed as an agent of a principal with the authority to act on the principal's behalf: expressly, impliedly, by apparent authority, or by estoppel. *See Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987). However, "agency cannot be assumed from the mere fact that one does an act for another." *See Bross v. Varner*, 159 Pa.Super. 495, 48 A.2d 880, 881 (1946).

According to Attorney Beltrami, the only representations he made to his uncle were along the lines of "we'll try to make a deal, we'll try to come up with some type of deal, we'll do something at some point, I'm sure we'll get a deal." *See* Transcript of 6/26/01 at 133, lines 25, 1–2. The only other person, besides Joseph, who may have been a party to these communications was Attorney Santora. He testified that Attorney Beltrami may have said words to the effect of "we'll agree to work it out, Uncle Joe, let's just, you know, go forward," or "Look, let's go forward with the litigation. It's always our best interest to do that. It's in all of our best interest to do that. You know, we'll talk, or, you know, we'll, you know, we'll keep talking." *See* Transcript of 6/27/01 at 88–89, lines 13–17, 4–7. Even if Attorney Beltrami could be viewed as acting as his father's agent, these comments conveyed nothing more than promises that negotiations would continue if he returned and hope that a final agreement would eventually be reached. The Court views these comments as nothing more than promises to continue negotiations and not promises that Louis would eventually agree to Joseph's terms of employment.

The Court therefore denies Joseph's request for relief based on a misrepresentation theory.

An Order will follow.

### *ORDER*

For those reasons indicated in the Opinion filed this date, **IT IS HEREBY**

**ORDERED** that the Class 6 Claim of Joseph Beltrami is allowed in the amount of $7,075.50.